OPINION
{¶ 1} Appellant, Mr. Edmund L. Reeds ("Mr. Reeds"), appeals from the July 18, 2007 judgment entry of the Lake County Court of Common Pleas, which sentenced him after his conviction by jury for felony murder and three counts of tampering with evidence. For the following reasons, we affirm.
 {¶ 2} Substantive and Procedural History *Page 2 
 {¶ 3} On May 7, 2007, the Lake County Grand Jury indicted Mr. Reeds for murder, in violation of R.C. 2903.02(A); felony murder, in violation of R.C. 2903.02(B); felonious assault, in violation of R.C.2903.11(A)(1); and three counts of tampering with evidence, in violation of R.C. 2921.12(A)(1). Mr. Reeds waived arraignment and the court entered a plea of not guilty to all charges.
 {¶ 4} A jury trial was held on June 4, 5, and 6, 2007. The state presented testimony of eleven witnesses: Greg Manning and Sam Shah from the Amerihost Motel; Eric Scott Reed, a paramedic; William "Terry" Coleman from the Lake County Coroner's Office; Sergeant Donald Durst, Lieutenant Ron Walters, Lieutenant Daniel Bachnicki, and Detective Craig Young, from the Lake County Sheriffs Department; as well as Raymond Jurz and Stephen LaBonne from the Lake County Crime Lab, and Dr. Fred Seligman, pathologist for the Cuyahoga County Coroner's Office. The state also submitted photographs and items from the scene, as well as Mr. Reeds' taped confessions, part of which were played for the jury.
 {¶ 5} On Saturday, February 10, 2007, at about checkout time at the Amerihost Motel in Concord Township, Ohio, the general sales manager, Mr. Greg Manning ("Mr. Manning") was awaiting the arrival of a guest, Mr. Peter Easthon ("Mr. Easthon"). Mr. Easthon, the victim in this case, had told Mr. Manning that he intended to switch rooms that morning. Mr. Easthon had been staying at the Amerihost Motel since January 29, 2007.
 {¶ 6} Since Mr. Manning did not hear from Mr. Easthon, he called the room at approximately 12:15 p.m. and then again at 12:20 p.m., at which time Mr. Manning sent the head housekeeper to investigate. The head housekeeper called back in moments *Page 3 
reporting that there was no response, and that she saw Mr. Easthon lying across the bed in an awkward position through the window. He told her to come back down and they would enter the room together in order to investigate further.
 {¶ 7} After knocking and getting no response, Mr. Manning used the master key to open the door. The T.V. and lights were on, the blinds were closed, and Mr. Easthon was lying across the bed with his feet pointed towards the door. Mr. Manning banged on the wall and called out to him. He then looked for indications of breathing. He observed no signs of breathing and noticed a large pool of blood beneath Mr. Easthon's head area. He immediately ran out of the room and into the adjacent room to call the police. Mr. Manning then called Mr. Sam Shah, an owner and general manager of Amerihost, who also called 911.
 {¶ 8} The Concord Township paramedics initially responded to the scene. Mr. Eric Scot Reed ("Mr. Reed"), a paramedic, who arrived in the ambulance with two other firefighter/paramedics and Lieutenant Clahoun, the shift lieutenant, testified that they arrived on the scene at approximately 12:45 p.m. The day manager directed them to room 303 and informed them that the guest appeared to be dead. When he entered the room Mr. Reed noticed Mr. Easthon was lying across the bed horizontally, with a sheet pulled over his head. He pulled the sheet down approximately eight to ten inches and observed a large pool of blood surrounding the back portion of Mr. Easthon's skull, as well as markings on his neck. He checked for a radial (wrist) pulse and found the body was already cold and stiff. No weapons were observed in the room; however, drugs and needles were found in the wastebasket by the bed. Mr. Reed called the Lake County Sheriffs Department to report the death. *Page 4 
 {¶ 9} Deputy Konrad Buchs received the initial call from dispatch and was the first to arrive on the scene, with Sergeant Donald Durst ("Sergeant Durst") arriving approximately one minute later. Sergeant Durst, surveying the room, observed no sign of a struggle or weapons, and began to look for identifying information for the victim. No wallet or identification card of any kind was found. However, a shoebox of paperwork found in the bottom drawer of the nightstand contained a letter addressed to Mr. Easthon concerning a lawsuit settlement. Among other miscellaneous paperwork, the box also contained a living will. Dispatch confirmed Mr. Easthon's identity, responding with a physical description of Mr. Easthon that matched the victim, and further advised that there was a warrant outstanding for the victim's arrest. Drugs were found next to Mr. Easthon's right leg, and the nightstand contained syringes and cigarettes.
 {¶ 10} Lake County Coroner, Dr. Rizzo, and his chief investigator, Mr. William "Terry" Coleman ("Mr. Coleman"), arrived on the scene. Mr. Coleman photographed the victim and the motel room. In addition to the blood, he noticed a small laceration on the bridge of Mr. Easthon's nose, bruising around his eye, as well as to the left eye socket. He also observed two puncture wounds on the left side of the victim's neck. Having determined the death was unnatural, he called detectives to the scene. After the room was processed, the body was transported to Lake East Hospital and then transferred to the Cuyahoga County Coroner's Office.
 {¶ 11} Lieutenant Ron Walters ("Lieutenant Walters") received a call from Sergeant Durst to investigate the incident. He in turn contacted Detective Daniel Banchnicki ("Detective Banchnicki") and Deputy Stranahan. Lieutenant Walters was familiar with Mr. Easthon from two prior occasions. He knew that Mr. Easthon was not *Page 5 
physically well in that he had sustained injuries to his legs, had a difficult time walking and used a cane for assistance. In addition, Mr. Easthon had a long history of drug use, as well as some sort of emphysema. He described Mr. Easthon as a large man, whose legs were of varying length and that due to this, Mr. Easthon wore an orthopedic shoe to elevate his foot about two inches. In his observations of Mr. Easthon at the scene, Lieutenant Walters did not observe any knife wounds on his hands, but did notice old scratch marks.
 {¶ 12} Detective Bachnicki, who photographed the scene, was also familiar with Mr. Easthon from prior dealings. He drew the conclusion that there was no sign of a struggle in the motel room because items in the room, although in disarray, were not disturbed. In addition, he discovered a $2,000 money wrapper in the motel room safe and noticed that the sink near the drain assembly was stained with blood. Swabs, syringes, as well as cocaine and a spoon with drug residue were also found. He then found Mr. Easthon's track phone and noticed that there were calls made the night before at 11:31 p.m. and earlier that morning at 5:31 a.m. Both were later identified as being from Mr. Reeds.
 {¶ 13} Dr. Fred Seligman ("Dr. Seligman"), the pathologist for the Cuyahoga County Coroner's Office, received Mr. Easthon's body on February 11, 2007, and determined that the cause of death was from multiple stab wounds to the neck. The first stab wound was just below the jaw on the left side of Mr. Easthon's neck. It did not pierce any vital structures, but was large enough that stitches would have been required. The second stab wound, on the lower left side of Mr. Easthon's neck, was the fatal knife wound, which pierced his left internal and external jugular veins, penetrating *Page 6 
to the cervical spine between the fourth and fifth vertebrae. The third stab wound, in front of the neck at the midline, was half of an inch deep and did not penetrate any vital structures.
 {¶ 14} Mr. Easthon also suffered blunt impacts to his face, scalp, and extremities, which were consistent with coming into contact with another person's fist or body part. He had an old wound on his ankle, as well as surgery scars on his legs. His legs were also covered with fresh needle punctures, which indicated recent drug use. Although the officers testified that they did not observe blood or new injuries on Mr. Easthon's hands, Dr. Seligman observed injuries on both hands and a lot of blood on Mr. Easthon's fingertips. The toxicology report was positive for cocaine as well as breakdown products of the drug, which indicated that he was using cocaine for many hours. Mr. Easthon died from exsanguination, or loss of blood, which lasted approximately twenty to thirty minutes following the stabbing.
 {¶ 15} Detective Craig Young ("Detective Young") was tasked with compiling as much information as could be obtained on Mr. Easthon. The letters addressed to Mr. Easthon found in the shoebox revealed that he had been receiving mail at Jackson Towers, an apartment building in Painesville, in the care of Ms. Leeta Chervin ("Ms. Chervin"). Ms. Chervin gave Detective Young names of Mr. Easthon's acquaintances, naming both Mr. Reeds and a woman who happened to live in the same building, Ms. Susan Turner ("Ms. Turner") as friends. When Detective Young questioned Ms. Turner, she too referred him to Mr. Reeds.
 {¶ 16} The following Monday, Detective Young went to Mr. Reeds' residence in Leroy Township with Lieutenant Walters. He was greeted by Mr. Reeds' father, Milton *Page 7 
Reeds. Mr. Reeds appeared calm and said he knew about Mr. Easthon's death from reading the newspaper the day before. He explained that he became acquainted with Mr. Easthon three or four years ago through his cousin, Bruce Thomas, who was a neighbor of Mr. Easthon's when they resided in the same trailer-park. Detective Young then asked Mr. Reeds whether he would consent to completing the interview at the Lake County Sheriffs Department, which he willingly agreed to do. The detectives gave Mr. Reeds a ride to the station.
 {¶ 17} At the sheriffs department, Mr. Reeds informed them that Mr. Easthon was in bad physical shape, and that he had been going to the motel to check on him because he believed Mr. Easthon had cancer, was in pain, and had trouble getting around. He confirmed that Mr. Easthon had received a settlement in the amount of $30,000. He also admitted that he used drugs and smoked crack cocaine, but claimed that his use was nowhere near the level of Mr. Easthon's. He also mentioned that he had gone to the motel room to party with Mr. Easthon, Ms. Turner, and another woman, Mary. Mr. Easthon purportedly shared with everyone at the party that he had a lot of money in the room, and further, that he intended to buy a large amount of cocaine with it.
 {¶ 18} As he continued his investigation, Detective Young spoke with Ms. Turner four more times. Each time, Ms. Turner relayed inconsistent facts. She did, however, willingly agree to make a controlled, recorded call to Mr. Reeds. During the phone call Mr. Reeds was very uncomfortable, telling Ms. Turner that the call could be monitored. He then told her that he had heard of Mr. Easthon's death from Mr. Michael Martin ("Mr. Martin") later in the afternoon on the day of Mr. Easthon's death. Detective Young also *Page 8 
discovered that Mr. Reeds was observed at a BP gas station near the Amerihost Motel on the Friday before the murder. Due to the inconsistencies in Mr. Reeds' story they decided to interview him again.
 {¶ 19} On March 15, 2007, Detective Young, with Detective Bachnicki, drove to Mr. Reeds' residence for the second time. Mr. Reeds told them he would drive to the station for the interview. When they got to the sheriff's department, Mr. Reeds finally admitted to being in the motel room on February 9, 2007. He told the detectives that he went to the motel to visit early in the morning on February 10, 2007, and that Mr. Martin, who they called "Mopus," had called him and left a voicemail later that day to tell him that Mr. Easthon was dead. Mr. Reeds visited with Mr. Easthon until around midnight the night before, February 9, at which time he went to Tony's Bar in Painesville. A couple of hours later he went to visit a friend, Kurt Vest, where he continued drinking until roughly 5:00 a.m. By his own admission, he was "pretty intoxicated," and called Mr. Easthon to check in and see how he was doing. He went to visit, found the door to room 303 already open, and the two began "partying" and using cocaine.
 {¶ 20} While they were partying, Mr. Easthon told Mr. Reeds that he hired hit men, and was a killer. They continued to use cocaine, Mr. Easthon heavily so, when Mr. Reeds began to feel sick. He told Mr. Easthon that the drugs were making him sick and that they were bad. This caused Mr. Easthon to fly into a rage, accusing Mr. Reeds of taking his money. Mr. Reeds grew angry in response, denied that he took any money, and told Mr. Easthon in a vulgar term that a woman took his money and things grew heated. At that point, Mr. Reeds said that the argument "got out of control." *Page 9 
 {¶ 21} In the middle of the argument, Mr. Easthon called Mr. Martin, or "Mopus," and told him that "there was someone here who wants to talk to you," referring to Mr. Reeds and the "bad cocaine." Mr. Reeds claimed that Mr. Easthon then went to the nightstand and picked up a small steak knife, which he normally used to cut up his drugs, and turned back towards Mr. Reeds and tried to hit him with the knife. Mr. Reeds said that he hit Mr. Easthon in the jaw, the knife flew out of Mr. Easthon's hand, and that he then picked up the knife. At this point, Mr. Reeds explained that they continued to argue and wrestle on the bed, and in the struggle, the knife went into Mr. Easthon's neck. He was aware that he stabbed Mr. Easthon at least twice, but was not completely certain because he was "freaked out." Mr. Easthon was lying on the bed choking and gasping.
 {¶ 22} Mr. Reeds, panicking, threw a sheet over Mr. Easthon. By this time, Mr. Easthon was no longer making gasping noises and was lying with his eyes slightly open across the bed. In an effort to eliminate fingerprints, Mr. Reeds washed the knife in the sink and then poured rubbing alcohol down the side of Mr. Easthon's face. Taking both the knife and Mr. Easthon's wallet, he left the motel.
 {¶ 23} A second police interview was conducted with Mr. Reeds and in the excerpt that was shown to the jury, Mr. Reeds told the detectives that he acted in self-defense because Mr. Easthon had "flipped out" and that he did not strike or scratch him throughout the entire argument. Mr. Reeds did not know if any of Mr. Easthon's boastings were true, but he was aware that Mr. Easthon had issues and that he was on drugs. Mr. Easthon had told him that night that he was going to put out a "hit" on Mary *Page 10 
because she stole $15,000 from him. Mr. Easthon also told him that he was running out of money and was waiting on a check.
 {¶ 24} As he fled the motel, Mr. Reeds threw the knife out the window on the interstate. It was never located. He also took Mr. Easthon's wallet because he felt that the forty dollars he had paid Mr. Easthon for the cocaine should be returned since he was given "bad drugs." The wallet was found the next day just off Route 86, where Mr. Reeds had told the officers that he had thrown it out the window. The same DNA-type consistent with Mr. Reeds was found on cigarette butts in the hotel room and his fingerprints were identified on a Rave hairspray can that was in the room.
 {¶ 25} The state then rested its case in chief. Mr. Reeds made a Crim.R. 29 motion for acquittal, arguing that the felonious assault charge should be dismissed. The motion was overruled. The defense then rested and the state dismissed the murder and felonious assault charges, leaving one count of felony murder and three counts of tampering with evidence for consideration by the jury.
 {¶ 26} The jury returned guilty verdicts as to the count of felony murder, in violation of R.C. 2903.02(B), and the three counts of tampering with evidence, in violation of R.C. 2921.12(A)(1), felonies of the third degree. Sentencing was deferred and the matter referred to the probation department for a presentence investigation and victim statements.
 {¶ 27} Mr. Reeds was sentenced on July 5, 2007 to an indefinite prison term of fifteen years to life on the count of felony murder, and to five years each for each count of tampering with the evidence. The tampering with evidence sentences were ordered to be served concurrently, but consecutively to the felony murder sentence. *Page 11 
 {¶ 28} Mr. Reeds now timely appeals, raising four assignments of error:
 {¶ 29} "[1.] The trial court erred when it neglected to state the effect of a finding of self-defense in its instructions to the jury and denied a request for a separate finding of self-defense on the verdict form in violation of the defendant-appellant's rights to due process and fair trial as guaranteed by the Fifth and Fourteenth amendments to the United States Constitution and Sections 10 and 16, Article I of the Ohio Constitution.
 {¶ 30} "[2.] The trial court erred to the prejudice of the defendant-appellant when it denied his motion for acquittal made pursuant to Crim.R. 29(A).
 {¶ 31} "[3.] The trial court erred to the prejudice of the defendant-appellant when it returned a verdict of guilty against the manifest weight of the evidence.
 {¶ 32} "[4.] The trial court erred to the prejudice of the defendant-appellant when it failed to dismiss the felony-murder charge due to its being in violation of the defendant-appellant's due process and equal protection rights and rights against cruel and unusual punishment as guaranteed by the Ohio and United States Constitutions."
 {¶ 33} Jury Instructions on Self-Defense
 {¶ 34} In his first assignment of error, Mr. Reeds asserts that the trial court committed plain error when it instructed the jury on self-defense in that the instruction did not explicitly state that a finding of self-defense by a preponderance of the evidence requires a verdict of not guilty. He further contends that there should have been a separate finding regarding self-defense on the verdict form rather than simply guilty or not guilty. We find these contentions to be without merit.
 {¶ 35} Since Mr. Reeds failed to object below, we review for plain error. "Pursuant to [Crim.R. 30(A)], the failure to object to a jury instruction in a timely manner *Page 12 
generally constitutes a waiver of any claimed error relative to the instructions." State v. Cobb, 11th Dist. No. 2007-P-0004,2007-Ohio-5614, ¶ 21, citing State v. Holley (Dec. 17, 1999), 11th Dist. No. 98-A-0089, 1999 Ohio App. LEXIS 6101, 26. "Under Crim.R. 52(B), however, this court has the power to recognize plain error or defects involving substantial rights even if they are not brought to the attention of the trial court." Id., citing State v. Moreland (1990),50 Ohio St.3d 58, 62.
 {¶ 36} "In the context of a criminal case, a court of review should invoke the plain error doctrine with the utmost caution, under exceptional circumstances, and only to prevent a miscarriage of justice." Id. at ¶ 22, citing State v. Jenks (1991), 61 Ohio St.3d 259,282; State v. Long (1978), 53 Ohio St.2d 91, paragraph three of the syllabus; Holley at 26. "Thus, plain error does not exist unless, but for the error, the outcome of the proceeding would have been different." Id., citing Jenks at 282; Moreland at 62; Long at paragraph two of the syllabus; Holley at 26-27.
 {¶ 37} "After arguments are completed, a trial court must fully and completely give the jury all instructions which are relevant and necessary for the jury to weigh the evidence and discharge its duty as the fact finder." State v. Egolf, 11th Dist. No. 2000-L-113, 2003-Ohio-601, ¶ 23, citing State v. Comen (1990), 50 Ohio St.3d 206,210.
 {¶ 38} "A jury instruction is proper when: (1) the instruction is relevant to the facts of the case; (2) the instruction gives a correct statement of the applicable law; and (3) the instruction is not covered in the general charge to the jury." Id. at ¶ 24, citing Mentor v.Hamercheck (1996), 112 Ohio Ap.3d 291, 296.
 {¶ 39} Mr. Reeds first contends that the trial court erred in omitting from its instruction an explicit statement that "a finding of self-defense by a preponderance of *Page 13 
the evidence meant that Reeds was not guilty." However, this very issue was brought to the court's attention not by Mr. Reeds or his counsel, but by the state, and discussed in-chambers in the following colloquy:
 {¶ 40} "Mr. Kaplan [for the state]: There doesn't seem to be a portion of the instruction that explains to the jury what to do in the event there is some sort of finding on self-defense or if they don't just assume, left to vote on the count but it doesn't mention how self-defense plays into it.
 {¶ 41} "The Court: It's not guilty if they find by a preponderance of the evidence that he proved that it was self-defense then they are justified in finding him not guilty.
 {¶ 42} "Mr. Kaplan: That's correct, Your Honor, it's just not in the written instructions that I can see.
 {¶ 43} "The Court: Well, I don't know that it has to be I can tell them that.
 {¶ 44} "Mr. Kaplan: There is no objection.
 {¶ 45} "Mr. Perdue [Mr. Reeds' counsel]: There is no objection, to me it's one or the other.
 {¶ 46} "Mr. Kaplan: If there is no objection by Mr. Perdue then we have no objection."
 {¶ 47} Thus, not only did the state bring this issue to the court's attention, but Mr. Reeds' defense counsel did not even view this lack of a written instruction as an issue.
 {¶ 48} In orally instructing the jury, the court reviewed preponderance of the evidence and self-defense, explaining in relevant part: *Page 14 
 {¶ 49} "Now the defendant has interposed the defense to the State's charges and the State's evidence of self-defense. In order to establish a claim of self-defense, the defendant must prove by a preponderance of the evidence the following * * *.
 {¶ 50} "Now the defendant has the obligation of proving the claim of self-defense by a preponderance of the evidence. And a preponderance of the evidence is the greater weight of the evidence; that is, evidence that you believe because it outweighs or overbalances in your minds the evidence that is opposed to it.
 {¶ 51} "Now if you find that the defendant has failed to prove self-defense the state still has the obligation of proving all of its clams beyond a reasonable doubt. * * *"
 {¶ 52} The written jury instructions contain the same instruction and we cannot say that the lack of the explicit statement that Mr. Reeds now asserts should have been given and resulted in plain error. Rather, we find that there is nothing ambiguous or misleading about these instructions. It is clear the jury had to find self-defense by a preponderance of the evidence. Moreover, it was made explicitly clear that even if the jury failed to find Mr. Reeds had killed in self-defense, the state still needed to prove each element of felony murder beyond a reasonable doubt in order to find him guilty.
 {¶ 53} Mr. Reeds also contends that the verdict form should have contained a separate finding solely for self-defense. Before the judge dismissed the jurors for deliberations, the following colloquy occurred in-chambers:
 {¶ 54} "Mr. Perdue [Mr. Reeds' counsel]: Your Honor, isn't there a specific form —
 {¶ 55} "The Court: What? *Page 15 
 {¶ 56} "Mr. Perdue: Isn't there a specific form for the self-defense whether they find there is self-defense?
 {¶ 57} "The Court: No, I thought we just talked about that.
 {¶ 58} "Mr. Perdue: I don't note it on the form.
 {¶ 59} "The Court: There is nothing on the form. If they find that self-defense applies then the verdict is not guilty.
 {¶ 60} "Mr. Perdue: I just thought there would be a separate, I object.
 {¶ 61} "The Court: No, I've never given a separate finding."
 {¶ 62} The verdict form used in this case did not contain a separate finding for self-defense, but rather had a finding for each charge and a blank for the insertion of "guilty" or "not guilty." Self-defense is not mentioned on the verdict form at all. While it may be argued that inclusion of a separate finding relating to self-defense would ensure clarity, in this case, we cannot rule that the absence of such is error. Specifically, Mr. Reeds admitted to killing Mr. Easthon and the court charged on self-defense. Thus, the only conclusion that could be drawn through a finding of "not guilty" is that Mr. Reeds stabbed Mr. Easthon in self-defense.
 {¶ 63} Importantly, "a single jury instruction should not be judged in isolation but, instead, must be considered in the context of the overall charge." State v. Schlee, 11th Dist. No. 2004-L-070, 2005-Ohio-5117, ¶ 32, citing State v. Price (1979), 60 Ohio St.2d 136, paragraph four of the syllabus, citing Cupp v. Naughten (1973), 414 U.S. 141, 147. "Thus, the entire jury charge must be considered as a whole to determine whether plain error occurred." Id. A review of the court's oral and written jury instructions, and the jury verdict form reveals that there is nothing to suggest that but for the jury instructions, *Page 16 
the verdict would have been otherwise and that the jury was confused or misled. Rather, the jury had before it all the correct statements of law and aspects of the charges as they related to the case, and was instructed accordingly.
 {¶ 64} Moreover, in order to successfully assert the affirmative defense of self-defense, we note that Mr. Reeds was required to prove that he "was not the initial aggressor * * *." State v. Kidd, 11th Dist. No. 2006-P-0087, 2007-Ohio-6562, ¶ 54, citing State v. Vinson, 11th Dist. No. 2006-L-238, 2007-Ohio-5199, ¶ 49.
 {¶ 65} In his confession to the detectives, Mr. Reeds admitted that he threw the first punch. Indeed, as he relayed the incident, Mr. Easthon accused Mr. Reeds of stealing money. An argument ensued. Mr. Reeds admits that he hit Mr. Easthon in the jaw "once or twice." Mr. Easthon then stopped and made a phone call to "Mopus" before picking up the knife and continuing the argument. Instead of throwing the knife away after he successfully wrestled it from Mr. Easthon, Mr. Reeds stabbed him with it. Thus, even if we did find these instructions to be error, which we do not, the error would be harmless at best since Mr. Reeds failed to carry his burden of proof required to prove self-defense.
 {¶ 66} In State v. Garvin (Sept. 21, 1994), 3d Dist. No. 6-94-6, 1994 Ohio App. LEXIS 4147, a case apposite to the one at bar, the Third District Court of Appeals stated: "Regardless of the absence of any such objection, failure to include self-defense on the verdict forms does not rise to plain error. Per the reasoning stated above, there was lack of sufficient evidence to support a self-defense instruction; thus, its exclusion from the verdict forms has no prejudicial effect on appellant's rights." Id. at 11-12.
 {¶ 67} Mr. Reeds' first assignment of error is without merit. *Page 17 
 {¶ 68} Sufficiency of the Evidence
 {¶ 69} In his second assignment of error, Mr. Reeds contends that the trial court erred in denying his Crim.R. 29(A) motion for acquittal since the state produced insufficient evidence to support a conviction for felony murder. Specifically, Mr. Reeds argues that the state failed to produce sufficient evidence to prove that he "knowingly" committed serious physical harm to Mr. Easthon. We find this contention to be without merit.
 {¶ 70} "As this court stated in State v. Schlee (1994), 11th Dist. No. 93-L-082, 1994 Ohio App. LEXIS 5862, at 13, the standard of review for a sufficiency of the evidence claim is `whether after viewing the probative evidence and the inference[s] drawn therefrom in the light most favorable to the prosecution, any rational trier of fact could have found all the elements of the offense beyond a reasonable doubt. The claim of insufficient evidence invokes an inquiry about due process. It raises a question of law, the resolution of which does not allow the court to weigh the evidence. * * *' (Citations omitted.) `In essence, sufficiency is a test of adequacy[;] [w]hether the evidence is legally sufficient to sustain a verdict * * *.'" State v. Pesec, 11th Dist. No. 2006-P-0084, 2007-Ohio-3846, ¶ 45, citing State v. Thompkins (1997),78 Ohio St.3d 380, 386. "Thus, sufficiency of the evidence tests the burden of production." Id., citing Thompkins at 390.
 {¶ 71} Mr. Reeds contends that the state failed to produce evidence that he knowingly committed serious physical harm to Mr. Easthon. Thus, he argues that the state failed to carry its burden of proof on the underlying felonious assault component of his felony murder conviction. Mr. Reed contends that the evidence and testimony of *Page 18 
whether there was a struggle was so contradictory that reasonable minds could not conclude that he knowingly stabbed Mr. Easthon.
 {¶ 72} R.C. 2903.11 sets forth, in pertinent part, the charge of felonious assault:
 {¶ 73} "(A) No person shall * * *:
 {¶ 74} "(1) Cause serious physical harm to another * * *."
 {¶ 75} Pursuant to R.C. 2901.22(B), a person acts "knowingly" when "he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist."
 {¶ 76} Guidance is provided in the Ohio Jury Instructions "as to how this mental state is determined, as follows:
 {¶ 77} `Since you cannot look into the mind of another, knowledge is determined from all the facts and circumstances in evidence. You will determine from these facts and circumstances whether there existed at the time in the mind of the defendant an awareness of probability that' his acts will probably cause serious harm * * * or physical harm by means of a deadly weapon." State v. Johnson, 11th Dist. No. 2006-L-259,2007-Ohio-5783, ¶ 49, quoting 4 OJI 409.11.
 {¶ 78} In this case, a review of the evidence reveals that the state presented sufficient evidence from which reasonable minds could conclude that Mr. Reeds knowingly committed serious physical harm to Mr. Easthon when he stabbed his neck not once, but three times. One wound was so deep and stabbed with such force it punctured his jugular vein and penetrated his fourth and fifth vertebrae. Indeed, Mr. Reeds not only admitted to committing the murder and stabbing Mr. Easthon several *Page 19 
times, but he also admitted that he threw the first punch. It was then, according to Mr. Reeds, that Mr. Easthon retrieved the knife and attempted to strike him with it. Mr. Reeds managed to wrestle the knife away, and chose to defend himself by stabbing Mr. Easthon in the neck three times. Thus, from Mr. Reeds own confession there is sufficient evidence that he knowingly committed serious physical harm to Mr. Easthon.
 {¶ 79} In State v. Johnson, supra, this court recently remarked in affirming the sufficiency of the evidence in a felonious assault stabbing case where the knife penetrated the victim's vital organs in a four-stabbing assault: "Stabbing Ms. Clark, especially in the area of her vital organs, further demonstrates that appellant was aware his conduct would probably result in serious physical harm or physical harm with a deadly weapon. This court has held that where a defendant admits he knew that stabbing a person in a vital area would cause serious physical harm, this is sufficient proof the defendant knowingly caused physical harm with a knife." Id. at ¶ 50-51, citing State v. DeRito
(Sept. 11, 1998), 11th Dist. No. 97-L-052, 1998 Ohio App. LEXIS 4257, 6.
 {¶ 80} Mr. Reeds contends that he was engaged in a "life or death wrestling match" over the control of the knife in the hotel room. He contends that because Mr. Easthon suffered from contusions and had blood and scratches on his hands that the state produced insufficient evidence that a struggle did not occur in the hotel room. In addition, Mr. Reeds argues for the first time on appeal that the angle of the knife suggests that the stabbing was done in self-defense. We note that this contention is pure speculation as he did not introduce evidence of such to the jury, but chose to rest after the state's case in chief. *Page 20 
 {¶ 81} From the state's evidence, the jury could well have come to a reasonable conclusion that there was no struggle as the state introduced photographs of the scene that depicted items quite near the bed were undisturbed. Located on the floor next to the bed was a small overturned wicker basket, upon which rested a tray with a pair of eyeglasses neatly placed. There were numerous little items strewn about on the nightstand and around the vicinity of the bed. However, none were toppled over. The hotel room, while it admittedly had a "lived in" appearance, did not display signs of a struggle. Moreover, several witnesses, including Detective Bachnicki, Paramedic Mr. Reed, and Sergeant Durst opined that there was no evidence of a struggle. "In analyzing a motion for acquittal, the reviewing court is bound to view the evidence presented in a light most favorable to the state, not to assess the credibility of the witnesses." Id. at ¶ 34, citing Jenks at 273.
 {¶ 82} Whether there are inconsistencies between the officers' testimony that they did not see signs of blood or scratches on Mr. Easthon's hands and the testimony of Dr. Seligman, the coroner, who opined that Mr. Easthon's hands were covered in blood, this contradiction in testimony goes to the manifest weight of the evidence, which Mr. Reeds raises in his third assignment of error. "In reviewing the sufficiency of the evidence, the relevant inquiry is whether the state has presented evidence on each element of the crime. In contrast, * * *, manifest weight contests the believability of the witnesses." Id. at 35.
 {¶ 83} Our review of the evidence reveals that the state presented sufficient evidence on each element of the crime upon which the trier of fact could reasonably *Page 21 
conclude that Mr. Reeds knowingly intended to cause Mr. Easthon serious physical harm when he took the knife and stabbed him in the neck three times.
 {¶ 84} Mr. Reeds' second assignment of error is without merit.
 {¶ 85} Manifest Weight of the Evidence
 {¶ 86} In his third assignment of error, Mr. Reeds challenges the manifest weight of the evidence. Specifically, Mr. Reeds argues that his conviction is against the manifest weight of the evidence because he proved by a preponderance of the evidence that he stabbed Mr. Easthon in self-defense. We find this argument to be without merit.
 {¶ 87} "When reviewing a claim that a judgment was against the manifest weight of the evidence, an appellate court must review the entire record, weigh both the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving conflicts, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that a new trial must be ordered." State v. Armstrong, 11th Dist. No. 2007-G-2756,2007-Ohio-6405, ¶ 15, citing Pesec at ¶ 74, citing State v. Floyd, 11th Dist. No. 2005-T-0072, 2006-Ohio-4173, ¶ 8, citing State v. Martin
(1983), 20 Ohio App.3d 172, 175. See, also, Thompkins at 387.
 {¶ 88} "The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against a conviction." Id. at ¶ 16, citing Pesec at ¶ 75,Floyd at ¶ 9, Martin at 175. "The role of the appellate court is to engage in a limited weighing of the evidence introduced at trial in order to determine whether the state appropriately carried its burden of persuasion." Id., citing Pesec at ¶ 75, Floyd at ¶ 9, citingThompkins at 390 (Cook, J., concurring). "The reviewing court *Page 22 
must defer to the factual findings of the trier of fact as to the weight to be given to the evidence and credibility of witnesses." Id., citingPesec at ¶ 75, citing Floyd at ¶ 9, citing State v. DeHass (1967),10 Ohio St.2d 230, paragraph one of the syllabus.
 {¶ 89} Based on the evidence and testimony the state presented at trial, we cannot conclude the jury so lost its way or created a manifest miscarriage of justice when it convicted Mr. Reeds for felony murder. A review of the evidence and testimony at trial reveals that Mr. Reeds and Mr. Easthon were heavily abusing drugs and that Mr. Reeds was highly intoxicated. Further, the partying soon got out of control when they began to accuse each other of bad drugs and stealing money.
 {¶ 90} By his own admission, the argument escalated when Mr. Reeds, angered by the accusation that he had taken Mr. Easthon's money, punched Mr. Easthon in the jaw. Mr. Easthon, in the middle of this, called "Mopus" and then grabbed the small knife. When Mr. Reeds wrestled the knife away, he stabbed Mr. Easthon three times, one stab plunging so deep that it reached his spinal cord. Evidence and testimony of the officers who were familiar with Mr. Easthon revealed that Mr. Easthon was not a well man. Indeed, he could barely walk and suffered from some type of respiratory disease. Moreover, as described above, the photographs of the scene did not evidence a struggle.
 {¶ 91} Mr. Reeds argues that the evidence established that he was not at fault for creating the situation since Mr. Easthon accused him of stealing money, and further, invited him to the hotel room. In addition, Mr. Reeds argues that the bruises on Mr. Easthon's face and scratches on his hand, as well as abrasions on his own knuckles *Page 23 
are evidence that he committed the stabbing because he was in imminent danger of his life.
 {¶ 92} As to whether this evidence supports Mr. Reeds' theory of self-defense or whether it supports a theory that the abrasions on Mr. Reeds' hand and subsequent bruises on Mr. Easthon's face is circumstantial evidence of a punch, "[i]t is well-settled that when assessing the credibility of witnesses, `[t]he choice between credibility of witnesses and their conflicting testimony rests solely with the finder of fact and an appellate court may not substitute its own judgment for that of the finder of fact." Id. at ¶ 29, citingState v. McKinney, Jr., 11th Dist. No. 2006-L-169, 2007-Ohio-3389, ¶ 49, citing State v. Grayson, 11th Dist. No. 2006-L-153,2007-Ohio-1772, at ¶ 31, citing State v. Awan (1986), 22 Ohio St.3d 120,123. "Furthermore, if the evidence is susceptible to more than one interpretation, a reviewing court must interpret it in a manner consistent with the verdict." Pesec at ¶ 78. (Citations omitted.)
 {¶ 93} In short, the jury was free to choose Mr. Reeds' theory of self-defense as presented through the state's case in chief. However, as our review of the above evidence reveals, the manifest weight of the evidence weighs heavily in a finding of guilt.
 {¶ 94} Mr. Reeds' third assignment of error is without merit.
 {¶ 95} Felony Murder Statute
 {¶ 96} In his fourth assignment of error, Mr. Reeds contends that the felony murder statute, R.C. 2903.02(B), is unconstitutional and violates his right to due process and equal protection, and further, constitutes cruel and unusual punishment. Specifically, Mr. Reeds contends that R.C.2903.02(B) is unconstitutional because it *Page 24 
fails to require the underlying felony be proved independently of the conduct that resulted in the murder. Thus, he contends the state is relieved of its burden of proving the requisite mens rea for murder, and further, that R.C. 2903.02(B) does not require as written, that the defendant murder "purposely." Moreover, he argues that R.C. 2903.02(B) violates his right to equal protection since the involuntary manslaughter statute, R.C. 2903.04(A), prohibits the identical activity, yet imposes different penalties.
 {¶ 97} We find these contentions to be wholly without merit since we have previously addressed these same arguments and determined that R.C.2903.02(B) is constitutional and does not offend notions of due process, equal protection, or constitute cruel and unusual punishment. SeeState v. Sprowls, 11th Dist. No. 2003-L-056, 2004-Ohio-6328, ¶ 25-26. See, also, State v. Hayden (July 14, 2000), 11th Dist. No. 99-L-037, 2000 Ohio App. LEXIS 3198, 9-14; State v. Bowles (May 11, 2001), 11th Dist. No. 99-L-075, 2001 Ohio App. LEXIS 2145, 25.
 {¶ 98} Mr. Reeds' fourth assignment of error is without merit.
 {¶ 99} Having found no error prejudicial to appellant, the judgment of the Lake County Court of Common Pleas is affirmed.
CYNTHIA WESTCOTT RICE, J., concurs,
 COLLEEN MARY OTOOLE, J., concurs in judgment only. *Page 1