[Cite as *State v. Jones*, 2020-Ohio-3367.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | No. 108371 |
| v. | : | |
| MELVIN JONES, | : | |
| Defendant-Appellant. | : | |

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** June 18, 2020

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-17-623707-E

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Brian Radigan and Carl J. Mazzone, Assistant Prosecuting Attorneys, *for appellee.*

Thomas Rein, *for appellant.*

EILEEN A. GALLAGHER, J.:

{¶ 1} Defendant-appellant Melvin Jones ("Jones") appeals his convictions for murder, trafficking, tampering with evidence and having weapons while under disability following a jury trial. He asserts that his convictions are not supported by

sufficient evidence and are against the manifest weight of the evidence. He further contends that (1) the trial court erred in failing to submit a separate jury verdict form on his defense of self-defense, (2) he was denied effective assistance of counsel because trial counsel did not request a separate jury verdict form on his defense of self-defense, (3) the trial court erred in imposing consecutive sentences on the firearm specifications associated with the murder and trafficking counts and (4) the trial court erred by ordering Jones, in its sentencing journal entry, to pay costs that were not imposed at the sentencing hearing. For the reasons that follow, we affirm.

**Procedural History and Factual Background**

{¶ 2} On December 5, 2017, a Cuyahoga County Grand Jury indicted Jones on nine counts:

- one count of aggravated murder in violation of R.C. 2903.01(B) with one-year and three-year firearm specifications and a weapon forfeiture specification (Count 1);

- one count of aggravated robbery in violation of R.C. 2911.01(A)(1) with one-year and three-year firearm specifications and a weapon forfeiture specification (Count 2);

- one count of aggravated robbery in violation of R.C. 2911.01(A)(3) with one-year and three-year firearm specifications and a weapon forfeiture specification (Count 3);

- one count of murder in violation of R.C. 2903.02(B) with one-year and three-year firearm specifications and a weapon forfeiture specification (Count 4);

- one count of felonious assault in violation of R.C. 2903.11(A)(1) with one-year and three-year firearm specifications (Count 5);

- one count of involuntary manslaughter in violation of R.C. 2903.04(A) with one-year and three-year firearm specifications and a weapon forfeiture specification (Count 6);

- one count of trafficking in violation of R.C. 2925.03(A)(1) with one-year and three-year firearm specifications and a weapon forfeiture in a drug case specification (Count 7);

- one count of tampering with evidence in violation of R.C. 2921.12(A)(1) with a weapon forfeiture specification (Count 8) and

- one count of having weapons while under disability in violation of R.C. 2923.13(A)(2) with a weapon forfeiture specification (Count 9).

{¶ 3} The charges arose out of the November 26, 2017 shooting death of DeShaun Perkins ("Perkins") at the townhouse apartment of Rebecca Perchinski ("Perchinski"), located at 18008 Parkmount Avenue in Cleveland, in connection with an alleged drug transaction.

{¶ 4} Jones pled not guilty to the charges, and the case proceeded to trial on February 4, 2019. Jones waived his right to a jury trial on the having weapons while under disability charge (Count 9), which was tried to the bench. The remaining counts were tried to a jury.

{¶ 5} Fourteen witnesses testified on behalf of the state. Those witnesses included eyewitnesses to events before or after the shooting, several police officers and detectives, a paramedic who treated Perkins, forensic scientists who analyzed evidence from the scene and the doctor who supervised Perkins' autopsy. Jones testified in his defense. A summary of the evidence presented at trial that is pertinent to the issues raised on appeal follows.

**Evidence Presented by the State**

{¶ 6} Perchinski testified that on the morning of November 26, 2017, she received a phone call from a friend, Michael Patterson ("Patterson"), who asked her if she knew where he could get some cocaine. Perchinski stated that she called Kelvin Harrell ("Harrell"), one of her best friends, and asked Harrell if he knew anyone who could sell Patterson cocaine. Perchinski testified that Harrell responded, "Okay." Perchinski testified that Harrell then came over to her apartment and they "hung out" for a while until Patterson arrived. At the time of the incident, "Jay" (Patterson's stepbrother), "Shanice," Jay and Shanice's baby, Sandra Echols (Jay's mother and Patterson's stepmother) and Tangelica Ray and her baby were staying with Perchinski and her two young children in Perchinski's two-bedroom, one-bathroom apartment. Jay and Shanice were not at the apartment at the time the incident occurred.

{¶ 7} According to Perchinski, Patterson arrived at her apartment sometime between 9:00 and 10:00 a.m. When he arrived, Patterson and Harrell had a conversation. Perchinski stated that she did not hear what they were saying. Afterwards, Patterson, Harrell and Perchinski were "just hanging out" and "talking" and Patterson left "about an hour or so later." Perchinski testified that Harrell remained at Perchinski's apartment the rest of the day and that the two of them "[j]ust hung out, chilled, played with the kids, like we do any other day."

{¶ 8} Harrell testified that on the morning of November 26, 2017, he received a telephone call from Perchinski asking him to come over to her apartment.

Harrell stated that, after he arrived, he had a conversation with Perchinski in which she asked him whether he knew someone who had cocaine for sale. Harrell testified that he was not a drug dealer and did not know any drug dealers but stated that he told Perchinski he would "make a phone call and find out." Harrell testified that he called Anton Perkins ("Anton"), his sister's "baby daddy," and asked him if he knew anyone who could get some cocaine. Harrell said that Anton told him he would make a call and get back to him. Approximately twenty minutes later, Anton called him back and said he "found somebody." Harrell confirmed prior arrangements with Anton to pick him and drive him to the east side and waited for Anton to arrive.

{¶ 9} Anton testified that Harrell called him on November 26, 2017 and asked him if he could help out someone who was looking to buy an ounce of cocaine. Anton stated that he "only ha[d] a little bit of that amount," so he called his older brother, Perkins, who also sold cocaine. Anton testified that they took "some of his and what I had and put it together" and made plans to offer that to Harrell's buyer. After speaking with Perkins, Anton "flipped over" and told Harrell "the price and everything." According to Anton, Harrell placed him on hold for about two minutes, then told Anton "all right." Perkins' car had a flat tire, so Perkins borrowed a car from a friend, picked Anton up and headed to Harrell's apartment. According to Anton, Perkins had left his gun in his car with the flat tire. Anton stated that he, nevertheless, felt "comfortable" because he knew everyone in the neighborhood who dealt drugs, so he "just figured we was good."

{¶ 10} Patterson testified that he called Perchinski on November 26, 2017 because she had previously told him that her brother had "some coke that he was trying to get rid of" and he wanted some. He stated that Perchinski told him she would "make the call" and would call him back "when she called her peoples to confirm that it was okay to come over." He said that Perchinski called him back and that he and Jones walked over to her apartment later that afternoon to complete the transaction. Patterson testified that the plan was for Jones to pay $1,200 for an ounce of cocaine, but that he did not know who was going to be selling the drugs to them.

{¶ 11} Sometime during the afternoon of November 26, 2017, Patterson arrived at Perchinski's apartment with Jones and Anton arrived at the apartment with Perkins.

{¶ 12} Perchinski testified that after she met everyone, she went into her bedroom (which was located across the hall from the bathroom) with Ray and their children. She stated that she was on her cell phone video chatting while Jones, Patterson, Perkins and Anton were in the living room with Echols. Anton testified that Harrell met him and Perkins outside and that he and Perkins then entered the apartment with Harrell and met Patterson, Jones and Echols. According to Anton, Perkins had the cocaine they were planning to sell to Harrell's buyer. Anton denied seeing Perchinski when they arrived at her apartment.

{¶ 13} Perchinski testified that she came out of the bedroom "for a second here and there * * * to get some water or a pop" and checked to see how everyone

was doing, then returned to her bedroom. Perchinski testified that she knew about the planned drug deal but had "figured it was done with and over with, and * * * that everybody was hanging back and having fun."

{¶ 14} Perchinski stated that at some point, "[i]t started to get a little loud from the laughing and talking and stuff like that," and that she told Patterson, Jones, Perkins and Anton they had to leave. According to Perchinski, the four men left and Harrell left with them. After the men left, Perchinski returned to her bedroom with Ray and the kids. Harrell testified that he did not recall Perchinski telling anyone to leave her apartment.

{¶ 15} Patterson testified that he was responsible for negotiating the transaction on Jones' behalf and that, shortly after they arrived, he and Perkins went into the bathroom to "negotiate a price exchange." He stated that he and Jones wanted to "cook it," i.e., to test the purity of the cocaine, before they bought it. Patterson tried a line of the cocaine, came out of the bathroom and told Jones it was "good."

{¶ 16} Jones and Perkins then went into the bathroom. Anton testified that when they came out a minute later, Perkins told Anton that Jones did not have all the money, i.e., he only had $1,100, and Perkins told him they wanted $1,500. According to Anton, Jones said he needed to go home to get the rest of the money and left. Anton testified that after Jones left, Perchinski opened the door to the bedroom and that he saw her, Ray and the three children for the first time.

{¶ 17} Patterson testified that after he told Jones the cocaine was "good," Jones said he "would be right back." Patterson assumed that Jones was "going to get some more money." Patterson testified that he knew Jones had a gun — a black Hi-Point 9 mm handgun with a clip. Patterson stated that he had seen the gun four or five times and had held it a couple of times but that did not know, at that time, whether Jones had had the gun with him that day.

{¶ 18} Harrell testified that he had been in the bedroom talking with Perchinski and Ray and that, when he came out of the bedroom, Jones said he had to go somewhere. After Jones left, Anton, Perkins, Patterson, Harrell and Echols continued conversing in the living room.

{¶ 19} After Jones had been gone for what seemed like a considerable length of time, the men began to grow impatient. Patterson testified that he left to see what was taking Jones so long. He stated that he met Jones as Jones was coming back and that he told Jones that Perkins and Anton were about to leave.

{¶ 20} Harrell testified that he had a "bad feeling" and that it "look[ed] fishy" because "it never takes that long to go do anything." Harrell said that he told Anton and Perkins they should just leave but that Anton and Perkins insisted on waiting a few more minutes to see if they could complete the drug transaction.

{¶ 21} Anton testified that when Jones did not come back right away, he, Perkins and Harrell decided to leave because "[i]t just wasn't right. We knew it." Harrell, Anton and Perkins got into Perkins' vehicle and were about to drive to the east side of Cleveland when they saw Patterson and Jones round the corner towards

Perchinski's apartment. Anton testified that the two men "broke off" from one another and that Jones walked toward the back door and Patterson walked toward the front door. According to Anton, when Patterson saw Perkins outside by the vehicle, Patterson motioned for Jones to come to the front door.

{¶ 22} Anton testified that he had "concerns" but that they could not leave because Perkins had left the car keys in Perchinski's apartment. Anton stated that Perkins told him and Harrell to stay in the car. Harrell remained in the car, but Anton followed Perkins to the front door. Anton testified that Echols told them that they could not all go into the house. He stated that this concerned him, but that Perkins told him to "be cool," so he waited outside with Patterson near the front door while Perkins and Jones went inside. Patterson testified that Perkins told him and Anton to wait outside.

{¶ 23} Perchinski testified that "a little while" after Harrell, Anton, Perkins, Jones and Patterson had left her apartment, she left her bedroom to get her daughter a package of fruit snacks. As she was walking to the kitchen, she saw Perkins and Jones come back into her apartment. Perchinski stated: "I just didn't think nothing of it. I figured they were about to do something, so I just go in my room and close the door. It will be done within a second, like. It's not my place, I just stayed out." Perchinski testified that she walked behind Perkins and Jones as they went into the bathroom. According to Perchinski, she then returned to her bedroom across the hall from the bathroom and closed the bedroom door. Perchinski stated that she did not see or hear anyone else go into the bathroom. According to Perchinski, at this

time, Ray and the children were in the bedroom with her and Echols was in the living room. Harrell, Anton and Patterson were not in the apartment.

{¶ 24} Perchinski testified that she gave her daughter the fruit snacks and "not even a minute later" without hearing any "fussing," "arguing," "tussling" or fighting, she heard a single gunshot. Perchinski stated that she stayed in the bedroom with the door closed until she heard Anton come into the apartment, asking, "Who got shot?" Perchinski stated that she then opened the door, saw Perkins lying on the floor and called 911. She testified that after speaking briefly with the 911 operator, she handed the phone over to Anton and tried to help Perkins by applying pressure to the wound in his chest. Perchinski testified that she did not see drugs or a gun in the bathroom (or anywhere else in the apartment), that she had not seen Jones or Perkins with a gun anytime that day and that she did not see Anton take any drugs or a gun from Perkins.

{¶ 25} Ray testified that she had spent most of the day in Perchinski's bedroom across from the bathroom. At one point in the afternoon, she heard a lot of noise and commotion and went out into the living room where she saw "[a] lot of men standing around." Ray stated that she pulled Perchinski aside and asked her what was going on, but received no meaningful response and then went back into the bedroom with the kids. Ray stated that later that afternoon, she left the bedroom again and went out into the living room. She saw Echols on the couch with her grandson. On her way, she passed Perchinski, who had been talking on the phone in apartment's other bedroom. According to Ray, she, once again, asked Perchinski

what was going on but never learned what was happening. Ray testified that as she walked back to Perchinski's bedroom, she saw "two people" go into the bathroom and close the door. She did not get a good look at them.

{¶ 26} Ray testified that "not even three minutes" after they closed the bathroom door, she "heard a gun go off." Ray stated that she grabbed Perchinski's daughter out of the hallway and pulled her into the bedroom, closed the bedroom door and "dropped to the floor" with the kids. Ray testified that as she was closing the door, Perchinski, who had been in the other bedroom talking on the phone, came back into her bedroom across from the bathroom. Ray stated that she opened the bedroom door and peeked out and saw someone run out of the bathroom and someone laying on the bathroom floor asking for help. Ray stated that she told Perchinski to call 911, but that Perchinksi was still "stuck in shock," so she took the phone from Perchinski and called 911 herself. She stated that Perchinski ultimately took the phone back and spoke with the 911 operator. Ray testified that when they heard the ambulance, she and Perchinski went outside to flag it down, then went back into the apartment.

{¶ 27} Anton testified that "[a] minute at the most" after Perkins and Jones went back inside the apartment, he heard a gunshot and ran back to the car because he "assumed," incorrectly, that Harrell had a gun. Anton stated that when he ran to the car, Patterson ran into the apartment. Anton testified that he was about to open the door to the apartment when he saw Jones and Patterson coming from the bathroom, exiting the apartment together. Anton testified that Jones "cleared the

door" by pointing a gun at him. According to Anton, when he saw the gun, he stepped back and gave Jones and Patterson space to run out of the apartment. Anton testified that Jones and Patterson were "tripping and stumbling over themselves" and then "took off" running.

{¶ 28} Anton testified that he went into the house and saw Perkins laying down sideways on the bathroom floor. Perkins told him that he had been shot in the heart. Anton stated that he did not see the drugs. According to Anton, Echols was next to the couch in the living room "screaming," Perchinski was out of the bedroom and the kids were running around. Anton stated that Perchinski brought him a phone and he called 911. Anton stated that he remained at the scene with Perkins until Perkins was transported by ambulance to MetroHealth Medical Center. Perkins died from the injuries he sustained in the shooting.

{¶ 29} Harrell testified that five to seven minutes after Jones and Perkins entered the house, Echols ran out of the apartment, looking "panick[ed]" and "terrified," screaming, "Oh, my God, he just shot him in the bathroom." Harrell stated that he did not see or hear anything until Echols ran out of the house. He testified that Jones then ran out of the door with a gun "swinging in his hoodie" or "jiggling in his hoodie pocket" and ran around the building. According to Harrell, Anton ran back to the car and Patterson "stood there for a minute, like, he was confused" then ran off in the direction of Jones. When Perkins did not come out of the apartment, Anton went inside to check on him. Harrell stated that Anton remained with his brother and no one else left the apartment until Perkins was

carried out to the ambulance. Harrell remained in the parking lot, called his sister (who was also Anton's girlfriend) and told her what had happened.

{¶ 30} Patterson testified that shortly after Perkins and Jones went back into the apartment, he heard a gunshot. He saw Echols running to the back door, "panicking," with her grandson in hand. He stated that he then saw Jones come out of the house, "angry," "hostile," "holding something around his mid section" and "biting his bottom lip." He testified that Jones told him: "He [referring to Perkins] was reaching, he tried to rob me." Patterson stated that he could not identify what Jones was holding and stated that he did not know if Jones had a gun on him at that time. Patterson stated that he saw Anton and initially thought Anton had a gun, so he ran off towards his house. Jones was running in the same direction. Patterson stated that Jones "left the situation" with the drugs he had been intending to purchase and that he did not see anyone else with a gun that day.

{¶ 31} Patterson testified that when he arrived at home, Jones was already there. His "baby momma" and children were also there. Patterson stated that Jones was holding a gun in his hand — the Hi-Point 9 mm gun that Patterson had previously seen with Jones. Patterson testified that Jones told him that Perkins "was reaching" and that Jones said he shot him, "like, I bust him."

{¶ 32} Patterson stated that Jones tried to give the gun to him and that, initially, he grabbed it, but that he then told Jones he could not keep the gun at his house. Patterson testified that he agreed to arrange for a ride for Jones in exchange for cocaine. Patterson stated that he and Jones did not have any cocaine before

going over to Perchinski's apartment, so he believed Jones got the cocaine from Perkins. Patterson testified that he introduced Jones to a friend, Tracy, who was also a drug user, and stated that Tracy agreed to give Jones a ride to the east side in exchange for some cocaine.

{¶ 33} Patterson testified that on the way to Tracy's house, he stopped in at a house on Flamingo Avenue and urinated in the backyard. While he was urinating, he saw Jones take off his hoodie, wrap the gun in it and hide it in a gap between the porch and the ground. They then continued on to Tracy's house. Tracy and her boyfriend gave Jones and Patterson a ride and dropped them off on East 116th Street. According to Patterson, he and Jones then went their separate ways.

{¶ 34} Police interviewed Perchinski and Harrell at the scene, then transported them to the homicide unit for further questioning, after which they were arrested. On cross-examination, Perchinski acknowledged that she "didn't tell [the police] everything" initially, including her role in the drug transaction. She also admitted that there were inconsistencies between what she initially told police and the version of events to which she testified at trial. Perchinski testified that during her first two police interviews, she told police that a tall, white male with blond hair (whom she did not know) was the person who came to her apartment with Jones. She stated that told this to police because, at the time, "everybody was trying to cover up for [Patterson's] identity." She also admitted initially lying to police about whether she had known Anton or Perkins prior to the incident and whether she had seen anyone entering or exiting the bathroom at the time of the incident. Perchinski,

however, ultimately provided police with the names of all others involved, including Harrell, Patterson, Anton and Jones (by the nicknames she claimed to have then known them) the night of the shooting and identified Jones in a photo the following day.

{¶ 35} Detective Walter Emerick with the Cleveland Police Department's Scientific Investigation Unit processed the scene following the incident. He testified that he recovered a single spent damaged bullet from the bathroom ceiling above the bathtub and a single spent cartridge casing from the ground. He stated that he did not see any firearms at the scene.

{¶ 36} Cleveland Police Detective Thomas Lynch was one of the homicide detectives assigned to investigate the shooting death of Perkins. He testified that police also recovered a cell phone from a table at the scene and found $1,381 in cash on Perkins at the time of his death.

{¶ 37} Detective Lynch and his partner interviewed Perchinski and Harrell at the homicide unit several hours after the incident to ascertain their version of events. The following day, Patterson called police and spoke with homicide detectives. Detective Lynch testified that Patterson told the detectives his version of the events, identified Jones in a photo and, using Google Earth, showed detectives where they could find the gun that had been used in the shooting. Detective Lynch testified that police went to the location identified by Patterson and recovered a Hi-Point 9 mm pistol and extended magazine wrapped in a gray sweatshirt underneath a wooden deck at 17913 Flamingo Avenue.

{¶ 38} On December 4, 2017, homicide detectives interviewed Anton and then arrested him. Anton identified Jones in a photo array. Efforts were made to locate Jones and he was arrested in Cocoa Beach, Florida on January 12, 2018.

{¶ 39} Perchinski, Anton and Harrell pled guilty to charges of involuntary manslaughter in connection with the incident and Patterson pled guilty to attempted involuntary manslaughter with a one-year firearm specification. All four individuals received favorable plea agreements in exchange for their cooperation and testimony at Jones' trial.

{¶ 40} Dr. David Dolinak, a deputy medical examiner with the Cuyahoga County Medical Examiner's Department, supervised the forensic pathology fellow who performed the autopsy of Perkins. Dr. Dolinak testified that Perkins sustained a perforating gunshot wound of the anterior chest, that Perkins' cause of death was a gunshot wound to the chest with skeletal, vascular, and visceral injuries causing hemorrhage and that the manner of death was homicide.

{¶ 41} Curtiss Jones, supervisor of the Trace Evidence Unit of the Cuyahoga County Medical Examiner's Office, collected evidence from Perkins' body and forwarded the samples to the DNA unit for testing. He testified that he performed a trace metal detection test on Perkins' hand to determine if he had recently held a metal object, such as a gun. Curtiss Jones indicated that the results of the test were negative, but not conclusive, because some people who are known to have handled metal objects do not react to the test.

{¶ 42} Curtiss Jones also testified that he examined the jacket Perkins had been wearing at the time he was shot. He stated that he found two bullet holes — one entrance defect and one exit defect. Based on his observations and chemical testing, Curtiss Jones determined that the bullet entered Perkins' body "[a]bout center chest" and that the approximate distance between the end of the barrel and the clothing at the time the weapon was fired, i.e., the muzzle-to-target distance, was an "intermediate distance," i.e., somewhere between one and four feet.

{¶ 43} James Kooser, a forensic scientist and firearms and tool marks examiner with the Cuyahoga County Regional Forensic Science Laboratory examined the Hi-Point 9 mm pistol, spent bullet and spent cartridge casing recovered by detectives. He testified that the bullet was "consistent with 9 mm caliber ammunition" but was "damaged" and could not be conclusively identified or eliminated as having been fired from the gun at issue. With respect to the spent cartridge casing, Kooser testified that, through microscopic examination and comparison of the recovered spent cartridge casing with test-fired cartridge casings from the recovered Hi-Point 9 mm pistol, he determined, to a reasonable degree of scientific certainty, that the recovered spent cartridge casing had been fired from the recovered Hi-Point 9 mm pistol.

{¶ 44} Dawn Shilens, the fingerprint lab supervisor for the Cuyahoga County Regional Forensic Science Laboratory, examined the magazine of the recovered Hi-Point 9 mm pistol for fingerprints. She testified that a latent fingerprint impression on the gun's magazine matched a sample from Jones' right thumb.

{¶ 45} Lisa Moore, a DNA analyst with the Cuyahoga County Regional Science Laboratory, tested various DNA samples collected in connection with the case. She testified that DNA collected from the grip, trigger, slide and barrel of the gun matched Jones and Patterson. She indicated no statistical support for a DNA match was identified between those parts of the gun and Perkins, Harrell or Perchinski. Moore stated that DNA collected from the sleeve cuffs of the gray hoodie recovered by police and DNA from the cell phone taken from the scene also matched Jones and that no statistical support for a DNA match was identified between those items and Perkins. Moore further testified that there was no statistical support for a DNA match between DNA collected from the back of Perkins' right hand and underneath his fingernails and Jones, Patterson, Harrell or Perchinski.

{¶ 46} At the close of the state's case, Jones moved for acquittal pursuant to Crim.R. 29(A) on all counts. The trial court denied the motion. Jones then testified in his defense, offering a different version of the events.

**Jones' Version of the Events**

{¶ 47} Jones testified that he had recently reconnected with Perchinski on social media and that she had invited him to come over. He stated that he arrived at Perchinski's apartment at approximately 1:15 p.m. on November 26, 2017. According to Jones, when he arrived, Jay, Shanice, their baby and Echols were in the kitchen and living room, and Patterson, Harrell, Perchinski, Ray and several children were in Perchinski's bedroom. Jones stated that he entered Perchinski's bedroom and began talking with her.

**{¶ 48}** Jones testified that, at the time, he was carrying approximately $1,400 he had earned working part-time at Bob Evans and on a construction job with his father. Perchinski said something to him about money, and he joked and said, "I['m] broke," showed her the $1,400, then put the money back in his pocket. According to Jones, Perchinski laughed and gave him a hug.

**{¶ 49}** Jones testified that after a while, he went back out into the living room to talk to Jay. Shanice had left, but Echols and the baby were still in the living room. Jones stated that he and Jay were talking and looking at online clothing sales for 30 to 45 minutes. Jones testified that Patterson came out and interrupted the conversation, indicating that the adults in the bedroom had just been smoking some strong marijuana and was encouraging him to buy some. Jones said he was not interested, and Patterson walked off.

**{¶ 50}** Jones stated that he and Jay continued watching videos until Jay had to leave to catch a bus around 4:00 or 4:15 p.m. Jones testified that he wanted to go to a convenience store, so he walked with Jay to the bus stop. According to Jones, he had been using his cell phone to show Jay merchandise online and left it on the table in Perchinski's living room. Approximately half way to the bus stop, Jones realized he had left his cell phone behind. Once Jay caught his bus, Jones walked back to Perchinski's apartment to get his cell phone.

**{¶ 51}** Jones testified that when he was approximately 20-30 feet from Perchinski's apartment, he saw Patterson. He stated that Patterson signaled to two men Jones did not recognize (later identified as Anton and Perkins) in the parking

lot, who then walked across the field towards Perchinski's apartment. Jones stated that by the time he made it to the front door, Patterson, Perkins and Anton were already there. He stated that Perkins and Patterson were talking and that Perkins was wearing a camouflage coat and black gloves.

{¶ 52} Jones testified that Patterson said, "[M]y boy needs a holler at you," and that Perkins asked him to go inside. Jones stated that Perkins went inside first and that Jones followed him. Patterson and Anton remained outside. Jones testified that as they were walking through the apartment, Perkins "brought something up to [him] about weed" and that he thought Patterson or somebody "had told him some bulls***." According to Jones, Perkins said that he did not want Echols, who was in the living room, "in his business," so he stepped into the bathroom and Jones followed. Jones testified that once in the bathroom, Perkins pulled out a gun and pointed it at Jones. Jones stated that he gave Perkins the $1,381 he had with him.

{¶ 53} Jones testified that Perkins then did something "weird" and "tucked [the money] somewhere," but not in a pocket or "anything like that." As he did so, Jones reached for the gun, which was in Perkins' left hand. According to Jones, he pushed the gun towards Perkins with his left hand and grabbed it with his right hand. Jones lost his footing and both men "trip[ped] forward," then Jones "tripped backwards" and Perkins fell forward on top of him. Jones testified that "[i]n the midst of us going down, the gun discharge[d]." One shot was fired; the gun fell to the ground and both men reached for it. Jones said he was closer to the gun and

grabbed it. Jones stated that he did not realize that Perkins had been shot; he just grabbed the gun and ran out.

{¶ 54} Jones testified that as ran out the front door of the apartment, he saw Patterson standing by the door and yelled, "Your dude just robbed me." Jones stated that he then kept running with the gun. Jones denied pulling the trigger but stated that his finger may have been on the trigger while he was holding the gun and running. Ultimately, Jones ended up at the apartment of Patterson's fiancée, Valencia. Jones stated that he had previously stayed at Valencia's apartment on a temporary basis in 2017 and had left some clothes behind.

{¶ 55} Jones testified that Patterson arrived at Valencia's apartment two or three minutes later, insisting that he had nothing to do with what had happened. Jones stated that he was familiar with the gun Perkins had used and knew that it was Patterson's gun. Jones indicated that Patterson "persuaded" him that he had left his gun at Perchinski's apartment and that Perkins must have picked it up there. Jones stated that he placed the gun on the counter and that, the last he knew, Patterson had the gun. Patterson arranged a ride for Jones to East 116th Street with a couple of Patterson's friends. Jones stated that, two or three days later, he flew down to Florida to work for his father on a construction project in Cocoa Beach, Florida. Jones was on probation at the time and admitted that he violated the terms of his probation by traveling to Florida without the permission of his probation officer.

{¶ 56} At the close of his case, Jones renewed his Crim.R. 29 motion based on the evidence he presented regarding his defense of self-defense. Once again, the trial court denied the motion.

**Verdicts and Sentencing**

{¶ 57} The jury found Jones guilty of murder (Count 4), felonious assault (Count 5), involuntary manslaughter (Count 6), trafficking (Count 7), tampering with evidence (Count 8) and the associated one-year and three-year firearm specifications and forfeiture specifications. The jury found Jones not guilty of aggravated murder (Count 1) and aggravated robbery (Counts 2 and 3). The trial court found Jones guilty of having weapons while under disability (Count 9) and the associated forfeiture specification.

{¶ 58} At sentencing, Counts 4, 5 and 6 were found to be allied offenses of similar import that merged for sentencing, and the state elected to have Jones sentenced on the murder count, Count 4. The court further found that all one-year firearm specifications merged into the three-year firearm specifications. The trial court then imposed an aggregate sentence of life in prison with parole eligibility after 21 years as follows:

> Defendant sentenced to a term of life in prison with parole eligibility after serving 15 years on Count Four with a 3 year firearm specification to be served prior to and consecutive to the base crime; a term of 12 months on Count Seven with a 3 year firearm specification to be served prior to and consecutive to the base charge in Count 7; a term of 24 months on Count Eight; a term of 24 months on Count Nine. All counts to run concurrently with each other. Both 3 year firearm specifications to run consecutive to each other for a total confinement in this case of life in prison with parole eligibility after serving 21 years. Post release

control is part of this prison sentence for a term of up to three years on Counts Seven, Eight and Nine. Parole is part of this prison sentence under Count Four and upon release, the defendant will be under the auspices of the Adult Parole Authority. * * * The court hereby enters judgment against the defendant in an amount equal to the costs of this prosecution.

{¶ 59} Although the trial court imposed costs in its sentencing journal entry, it did not impose costs at the sentencing hearing.

{¶ 60} Jones appealed, raising the following six assignments of error for review:

Assignment of Error I: The trial court erred by failing to grant a judgment of acquittal, pursuant to Crim.R. 29(a), on the charges, and thereafter entering a judgment of conviction of that offense as those charges were not supported by sufficient evidence, in violation of defendant's right to due process of law, as guaranteed by the Fourteenth Amendment to the United States Constitution.

Assignment of Error II: Appellant's convictions are against the manifest weight of the evidence.

Assignment of Error III: The trial court erred by not submitting a separate verdict form to the jury as to [the] affirmative defense of self-defense.

Assignment of Error IV: Appellant was denied effective assistance of counsel as guaranteed by Section 10, Article I of the Ohio Constitution and the Sixth and Fourteenth Amendments.

Assignment of Error V: The trial court erred by ordering convictions and a consecutive sentence for the firearm specifications because the trial court failed to make a proper determination as to whether those offenses are allied offenses pursuant to R.C. 2941.25 and they are part of the same transaction under R.C. 2929.14.

Assignment of Error VI: The trial court erred by ordering Appellant to pay costs in the sentencing journal entry when it said nothing about the issue on the record.

**Law and Analysis**

**Sufficiency of the Evidence and Manifest Weight of the Evidence**

{¶ 61} In his first and second assignments of error, Jones contends that the trial court erred in denying his Crim.R. 29 motion for acquittal and that his convictions were not supported by sufficient evidence and were against the manifest weight of the evidence. Although they involve different standards of review, because they involve many of the same arguments and a review of the same evidence, we address Jones' first and second assignments of error together.

{¶ 62} A Crim.R. 29(A) motion for acquittal tests the sufficiency of the evidence. *See, e.g., State v. Hale*, 8th Dist. Cuyahoga No. 107646, 2019-Ohio-3276, ¶ 80, citing *State v. Hill*, 8th Dist. Cuyahoga No. 98366, 2013-Ohio-578, ¶ 13. Accordingly, we review a trial court's denial of a defendant's motion for acquittal using the same standard we apply when reviewing a sufficiency-of-the-evidence challenge. *Id.*

{¶ 63} A challenge to the sufficiency of the evidence supporting a conviction requires a determination of whether the state met its burden of production at trial. *State v. Hunter*, 8th Dist. Cuyahoga No. 86048, 2006-Ohio-20, ¶ 41. When reviewing sufficiency of the evidence, an appellate court must determine "'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 77, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991),

paragraph two of the syllabus. In a sufficiency inquiry, an appellate court does not assess whether the evidence is to be believed but whether, if believed, the evidence admitted at trial would support a conviction beyond a reasonable doubt. *State v. Starks*, 8th Dist. Cuyahoga No. 91682, 2009-Ohio-3375, ¶ 25; *Jenks* at paragraph two of the syllabus.

{¶ 64} In contrast to a challenge based on sufficiency of the evidence, a manifest weight challenge attacks the credibility of the evidence presented and questions whether the state met its burden of persuasion. *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 13. Weight of the evidence "addresses the evidence's effect of inducing belief," i.e., "whose evidence is more persuasive — the state's or the defendant's?" *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386-387, 678 N.E.2d 541 (1977). When considering an appellant's claim that a conviction is against the manifest weight of the evidence, the appellate court functions as a "thirteenth juror" and may disagree "with the factfinder's resolution of * * * conflicting testimony." *Thompkins* at 387, citing *Tibbs v. Florida*, 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). The appellate court examines the entire record, weighs the evidence and all reasonable inferences that may be drawn therefrom, considers the witnesses' credibility and determines whether, in resolving conflicts in the evidence, the trier of fact "'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485

N.E.2d 717 (1st Dist.1983). Reversal on manifest weight grounds is reserved for the "'exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins* at 387, quoting *Martin* at 175.

{¶ 65} Jones contends that his conviction for murder was not supported by sufficient evidence and was against the manifest weight of the evidence because he "clearly acted in self-defense" and there was "no credible, reliable evidence" beyond "uncorroborated accusations" that Jones "was acting other than * * * in self-defense." He also asserts that the jury's "verdict is flawed" because all of his convictions were the result of improper inference stacking and that there is "no reliable evidence in the record" upon which "Jones should have been convicted of any charge given the facts in this case." Following a thorough review of the record, we disagree.

**Inference Stacking**

{¶ 66} We turn first to Jones' inference-stacking argument. Whether a conviction is based upon inference stacking goes to the sufficiency of the evidence. *See, e.g., State v. Maynard*, 10th Dist. Franklin No. 11AP-697, 2012-Ohio-2946, ¶ 26, citing *State v. Pilgrim*, 184 Ohio App.3d 675, 2009-Ohio-5357, 922 N.E.2d 248, ¶ 25 (10th Dist.). It is well-established that a trier of fact may not draw an inference solely and entirely upon another inference, where that inference is unsupported by any additional facts or inferences drawn from other facts. *See, e.g., State v. Brown*, 8th Dist. Cuyahoga No. 106518, 2018-Ohio-3674, ¶ 19 ("Ohio law precludes the stacking of inferences to prove a claim."). However, this rule is

"extremely limited." *State v. Kalman*, 8th Dist. Cuyahoga No. 90752, 2009-Ohio-222, ¶ 23. It does not prohibit the use of parallel inferences in combination with additional facts, and it does not prohibit the drawing of multiple inferences separately from the same set of facts. *Id.*; *see also State v. Doumbas,* 8th Dist. Cuyahoga No. 100777, 2015-Ohio-3026, ¶ 24 ("'An inference which is based in part upon another inference and in part upon facts is a parallel inference and, if reasonable, may be indulged in by a jury.'"), quoting *Hurt v. Charles J. Rogers Transp. Co.*, 164 Ohio St.3d 329, 130 N.E.2d 820 (1955), paragraph two of the syllabus. In other words, the rule against stacking inferences is limited to inferences drawn exclusively from other inferences. *See, e.g., State v. Braden*, 12th Dist. Preble No. CA2013-12-012, 2014-Ohio-3385, ¶ 13 ("'Since reasonable inferences drawn from the evidence are an essential element of the deductive reasoning process, the rule against stacking inferences is limited only to inferences drawn exclusively from other inferences.'"), quoting *State v. Cooper*, 147 Ohio App.3d 116, 2002-Ohio-617, 768 N.E.2d 1223, ¶ 38 (12th Dist.); *see also State v. Bernard*, 2018-Ohio-351, 104 N.E.3d 69, ¶ 50 (11th Dist.) ("'The rule against inference-stacking essentially forbids the drawing of an inference from evidence, which is too uncertain or speculative or which raises merely a possibility or conjecture. While reasonable inferences may be drawn from the facts and conditions established, they cannot be drawn from facts or conditions merely assumed.'"), quoting *State v. Armstrong*, 11th Dist. Portage No. 2015-P-0075, 2016-Ohio-7841, ¶ 23.

{¶ 67} In this case, Jones has not shown that any of his convictions resulted from improper inference stacking. In his brief, Jones asserts, in a general, conclusory fashion, that all of his convictions resulted from inference stacking by the trier of fact. He does not explain why he believes his convictions were the product of impermissible inference stacking and does not identify any inference that he contends was "stacked" upon another to support his convictions. He provides no legal authority and does not cite to relevant parts of the record in support of his contention. The sum and substance of Jones' inference-stacking argument is that "[a]ny testimony by the State reveals that it [was] based on inferences and that the jury, in order to convict Appellant of anything, including Murder B under Count 4, was then required to make further inferences based upon those other inferences." This does not comply with App.R. 16(A)(7). *See* App.R. 16(A)(7) ("The appellant shall include in its brief * * *[a]n argument containing the contentions of the appellant with respect to each assignment of error presented for review and the reasons in support of the contentions, with citations to the authorities, statutes, and parts of the record on which appellant relies."); *see also Brown*, 2018-Ohio-3674, at ¶ 19.

{¶ 68} "'It is the duty of the appellant, not this court, to demonstrate his assigned error through an argument that is supported by citations to legal authority and facts in the record.'" *State v. Moore,* 6th Dist. Wood No. WD-18-030, 2019-Ohio-3705, ¶ 84, quoting *State v. Taylor*, 9th Dist. Medina No. 2783-M, 1999 Ohio App. LEXIS 397, 3 (Feb. 9, 1999). An appellate court is not obliged to construct or

develop arguments to support a defendant's assignment of error and "will not 'guess at undeveloped claims on appeal.'" *See, e.g., State v. Piatt*, 9th Dist. Wayne No. 19AP0023, 2020-Ohio-1177, ¶ 39, quoting *McPherson v. Goodyear Tire & Rubber Co.*, 9th Dist. Summit No. 21499, 2003-Ohio-7190, ¶ 31; *see also State v. Collins*, 8th Dist. Cuyahoga No. 89668, 2008-Ohio-2363, ¶ 91 ("[I]t is not the duty of this Court to develop an argument in support of an assignment of error if one exists. * * * [T]his court may disregard arguments if the appellant fails to identify the relevant portions of the record from which the errors are based."), quoting *State v. Franklin*, 9th Dist. Summit No. 22771, 2006-Ohio-4569, ¶ 19; *Cardone v. Cardone*, 9th Dist. Summit No. 18349 and 18673, 1998 Ohio App. LEXIS 2028, 8 (May 6, 1998) ("If an argument exists that can support [an] assignment of error, it is not [the] court's duty to root it out.").

{¶ 69} Jones' inference-stacking argument is nothing more than a blanket statement; it is devoid of any meaningful analysis or supporting authority. This fact alone would be an adequate basis upon which to dispose of Jones' assignment of error. *See Piatt* at ¶ 39.

{¶ 70} Even if, however, we were to consider the merits Jones' inference-stacking sufficiency argument, we would find that the trial court did not err in denying Jones' Crim.R. 29 motion for acquittal. Viewed in the light most favorable to the state, we find that the evidence presented, along with the reasonable inferences to be drawn therefrom, were sufficient to support each of Jones'

convictions. No inference stacking was necessary to support Jones' convictions here.

{¶ 71} A conviction may rest solely on the testimony of a single witness, if believed, and there is no requirement that a witness' testimony be corroborated to be believed. *See, e.g., State v. Flores-Santiago*, 8th Dist. Cuyahoga No. 108458, 2020-Ohio-1274, ¶ 38; *State v. Black*, 8th Dist. Cuyahoga No. 108001, 2019-Ohio-4977, ¶ 43; *State v. Schroeder*, 4th Dist. Adams No. 18CA1077, 2019-Ohio-4136, ¶ 84; *State v. Dudley*, 9th Dist. Summit No. 28364, 2017-Ohio-7044, ¶ 10. Although there were no eyewitnesses to the shooting, eyewitness testimony is not necessary to sustain a conviction. *See, e.g., State v. Smoot*, 6th Dist. Wood No. WD-19-034, 2020-Ohio-838, ¶ 21 ("'Although physical evidence and eyewitness testimony is helpful to prove a case, it is not necessary.'"), quoting *State v. Martin*, 8th Dist. Cuyahoga No. 90722, 2008-Ohio-5263, ¶ 42; *see also State v. Robinson*, 10th Dist. Franklin No. 17AP-853, 2019-Ohio-558, ¶ 53 ("The fact that none of the state's witnesses observed appellant fire the shots is not dispositive; rather, as noted by the state, eyewitness testimony that he fired the weapon is not required to sustain a conviction."). Under Ohio law, circumstantial evidence and direct evidence have equal probative value, and, as such, "'reasonable inferences may be drawn from both direct and circumstantial evidence.'" *Smoot* at ¶ 21, quoting *State ex rel. Hardin v. Clermont Cty. Bd. of Elections*, 2012-Ohio-2569, 972 N.E.2d 115, ¶ 66 (12th Dist.).

{¶ 72} As detailed above, the state presented substantial evidence upon which the jury reasonably found, beyond a reasonable doubt, that Jones shot and

killed Perkins as a proximate result of his committing or attempting to commit felonious assault, i.e., knowingly causing serious physical harm to Perkins (supporting his conviction for murder in Count 4 and the guilty finding for felonious assault in Count 5); that Jones had attempted to conceal and dispose of the gun he had used in the shooting (supporting his conviction for evidence tampering in Count 8), and that Jones was complicit in the knowing sale or offer to sell of cocaine and had caused Perkins' death as a proximate result of drug trafficking or attempted drug trafficking (supporting his conviction for trafficking in Count 7 and the guilty finding for involuntary manslaughter in Count 6).

{¶ 73} Multiple witnesses testified regarding the planned drug transaction that gave rise to the shooting and Perkins' death, i.e., that Perkins was going to sell an ounce of cocaine to Jones for $1,200-$1,500.  Evidence was also presented from which it could be reasonably inferred that the drug transaction had been completed. Patterson testified that after the shooting, Jones had cocaine he had not had previously, and Detective Lynch testified that police found $1,381 on Perkins after he died.

{¶ 74} Ample witness testimony was also provided regarding the circumstances leading up to and immediately following the shooting from which reasonable inferences could be made regarding what occurred during the shooting. Perchinski testified that she was walking behind Perkins and Jones when they entered the bathroom shortly before the shooting.  She saw Perkins and Jones — and no one else — enter the bathroom.  She heard no one enter or leave the bathroom

before she heard a gunshot "not even a minute later." When she opened her bedroom, Perkins was on the bathroom floor alone with a gunshot wound to his chest and Jones was gone.

{¶ 75} Anton testified that immediately after he heard a gunshot, Jones ran out of Perchinski's apartment carrying a gun. Patterson testified that he saw Jones "holding something around his mid section" when he ran out of Perchinski's apartment and when Jones arrived at Patterson's house a few minutes after the shooting, Jones told Patterson that he had shot Perkins and tried to give Patterson the gun he had used in the shooting, which Patterson recognized as Jones' gun. Patterson further testified regarding Jones' attempt to conceal and dispose of the gun shortly after the shooting.

{¶ 76} The state also presented expert testimony establishing that the cartridge casing recovered at the scene matched the gun recovered by police, that Jones' DNA matched DNA found on the trigger, grip, barrel and slide of the gun and the sleeves of the gray hoodie that had enveloped the gun had been wrapped when recovered by police.

{¶ 77} Finally, the evidence that Jones had carried and used a firearm along with the certified journal entry reflecting Jones' prior conviction for a violent felony offense was sufficient to support Jones' conviction for having a weapon while under disability in Count 9.

**Self-Defense**

{¶ 78} Jones also contends that his convictions should be overturned because he acted in self-defense.

{¶ 79} Self-defense is an affirmative defense that a defendant must prove by a preponderance of the evidence. Former R.C. 2901.05(A);[1] *State v. Goff*, 128 Ohio St.3d 169, 2010-Ohio-6317, 942 N.E.2d 1075, ¶ 36. To prevail on a claim of self-defense involving the use of deadly force, a defendant must prove: (1) the defendant was not at fault in "creating the situation giving rise to the affray"; (2) the defendant had a bona fide belief that he or she was in imminent danger of death or great bodily harm and that the only means of escape from such danger was through the use of force and (3) the defendant did not violate any duty to retreat or avoid the danger. *See, e.g., State v. Bouie,* 8th Dist. Cuyahoga No. 108095, 2019-Ohio-4579, ¶ 37; *State v. Callahan*, 2016-Ohio-2934, 65 N.E.3d 155, ¶ 25 (8th Dist.), citing *State v.*

---

[1] Effective March 28, 2019, after the trial in this case, Ohio's self-defense law was changed to require the state to prove that a defendant did not act in self-defense where evidence was presented that "tend[ed] to support" that the defendant had acted in self-defense. The current version of R.C. 2901.05(B)(1) states:

> A person is allowed to act in self-defense, defense of another, or defense of that person's residence. If, at the trial of a person who is accused of an offense that involved the person's use of force against another, there is evidence presented that tends to support that the accused person used the force in self-defense, defense of another, or defense of that person's residence, the prosecution must prove beyond a reasonable doubt that the accused person did not use the force in self-defense, defense of another, or defense of that person's residence, as the case may be.

Accordingly, in reviewing Jones' assignments of error in this case, we apply the law as it existed prior to the amendment of R.C. 2901.05.

*Barnes*, 94 Ohio St.3d 21, 24, 759 N.E.2d 1240 (2002); *State v. Chavez*, 3d Dist. Seneca Nos. 13-19-05, 13-19-06 and 13-19-07, 2020-Ohio-426, ¶ 39-40.  As to the third element, "'[b]efore using deadly force in self-defense, a person must first use any reasonable means of retreat when attacked outside the confines of his or her own home.'" *Bouie* at ¶ 37, quoting *State v. Reynolds*, 10th Dist. Franklin No. 18AP-560, 2019-Ohio-2343, ¶ 39.  The elements of self-defense are cumulative; if a defendant fails to prove any one of the elements by a preponderance of the evidence, the defendant failed to demonstrate that he or she acted in self-defense.  *State v. Owens*, 8th Dist. Cuyahoga No. 98165, 2012-Ohio-5887, ¶ 12, citing *State v. Williford*, 49 Ohio St.3d 247, 551 N.E.2d 1279 (1990).

{¶ 80} Jones argues that the jury lost its way in finding that he did not act in self-defense because (1) his testimony established that Perkins was shot during a struggle for the gun after Perkins had robbed him at gunpoint and (2) the testimony of the witnesses presented by the state amounted to nothing more than "unreliable," "uncorroborated accusations."  Once again, we disagree.

{¶ 81}  This case came down to which version of events — and which witnesses — the jury found to be more credible:  The version of events to which Jones testified at trial or the version of events to which the other witnesses testified at trial.

{¶ 82} There were admittedly some inconsistencies between Perchinski's, Harrell's, Anton's, Patterson's and Ray's testimony regarding what happened on November 26, 2017 leading up to the shooting and what happened immediately following the shooting.  There were also some inconsistencies, as to certain

witnesses, between the version of events to which the witness testified at trial and the version of events the witness initially told police following the incident.

{¶ 83} However, a defendant is not entitled to reversal on manifest weight grounds merely because inconsistent evidence was presented at trial. *See, e.g., State v. Nitsche*, 2016-Ohio-3170, 66 N.E.3d 135, ¶ 45 (8th Dist.) ("[A] defendant is not entitled to reversal on manifest weight grounds merely because certain aspects of a witness's testimony are not credible or were inconsistent or contradictory."); *see also State v. Wade*, 8th Dist. Cuyahoga No. 90029, 2008-Ohio-4574, ¶ 38 ("'A conviction is not against the manifest weight of the evidence solely because the [factfinder] heard inconsistent testimony.'"), quoting *State v. Asberry*, 10th Dist. Franklin No. 04AP-1113, 2005-Ohio-4547, ¶ 11; *State v. Mann*, 10th Dist. Franklin No. 10AP-1131, 2011-Ohio-5286, ¶ 37 ("'While [a factfinder] may take note of the inconsistencies and resolve or discount them accordingly, * * * such inconsistencies do not render defendant's conviction against the manifest weight or sufficiency of the evidence.'"), quoting *State v. Nivens*, 10th Dist. Franklin No. 95APA09-1236, 1996 Ohio App. LEXIS 2245, 7 (May 28, 1996). Perchinski's, Harrell's, Anton's, Patterson's and Ray's accounts were consistent in many material respects, and the state's theory as to what occurred was supported by physical evidence, including DNA and fingerprint evidence linking Jones to the weapon used in the shooting.

{¶ 84} Further, the physical evidence did not support the defense theory as to what occurred. Although Jones claimed that the gun discharged during a struggle when Perkins was "on top" of him, Perkins' body did not show signs of any struggle

and DNA testing on the back of Perkins' hand and underneath his fingernails did not support the claim that Perkins had struggled with Jones. Likewise, there was no match for Perkins' DNA on the gun at issue. Although Jones claimed Perkins was wearing gloves, there was no evidence that any gloves were removed from Perkins after the shooting. Further, Jones' claimed proximity of the two men at the time of the shooting, i.e., a few inches apart or less, was inconsistent with the testing conducted by Curtiss Jones in which he concluded that the muzzle of the gun would have been between one and four feet from Perkins at the time he was shot.

{¶ 85} The jury was in the best position to assess the credibility of the witnesses who testified at trial. As the trier of fact, the jury was "'free to believe or disbelieve all, part, or none of the testimony'" of each of the witnesses presented at trial. *State v. Sheline*, 8th Dist. Cuyahoga No. 106649, 2019-Ohio-528, ¶ 100, quoting *State v. Colvin*, 10th Dist. Franklin No. 04AP-421, 2005-Ohio-1448, ¶ 34. A conviction is not against the manifest weight of the evidence simply because the jury believed the testimony of the state's witnesses and disbelieved the defendant. The fact that Jones testified concerning his affirmative defense of self-defense does not mean that the jury had to believe him.

{¶ 86} Following a thorough review of the record, weighing the strength and credibility of the evidence presented and the reasonable inferences to be drawn therefrom, we cannot say that this is one of those "'exceptional cases'" in which the trier of fact clearly lost its way and created a manifest miscarriage of justice that the

defendant's conviction must be reversed. *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541, quoting *Martin*, 20 Ohio App.3d at 175, 485 N.E.2d 717.

{¶ 87} Jones' first and second assignments of error are overruled.

**Failure to Give Jury Separate Verdict Form on Self-Defense**

{¶ 88} In his third assignment of error, Jones contends that the trial court erred in failing to give the jury a separate verdict form regarding his affirmative defense of self-defense. Jones did not object to the verdict forms below. He has, therefore, forfeited all but plain error. *See, e.g., State v. Ford*, 158 Ohio St.3d 139, 208, 2019-Ohio-4539, 140 N.E.3d 616, ¶ 350; *State v. Smith*, 8th Dist. Cuyahoga No. 98280, 2013-Ohio-576, ¶ 44.

{¶ 89} Under Crim.R. 52(B), "plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." The defendant "bears the burden of proof to demonstrate plain error on the record." *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, ¶ 22, citing *State v. Quarterman*, 140 Ohio St.3d 464, 2014-Ohio-4034, 19 N.E.3d 900, ¶ 16. To prevail, Jones must show that "an error occurred, that the error was plain, and that but for the error the outcome of the trial clearly would have been otherwise." *Ford*, 158 Ohio St.3d 139, 208, 2019-Ohio-4539, 140 N.E.3d 616, at ¶ 124, citing *State v. Mammone*, 139 Ohio St.3d 467, 2014-Ohio-1942, 13 N.E.3d 1051, ¶ 69; *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002). We recognize plain error "'with the utmost caution, under exceptional circumstances and only to prevent a

miscarriage of justice.'" *Mammone* at ¶ 69, quoting *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus.

{¶ 90} Jones has made no showing of plain error in this case.

{¶ 91} The trial court's charge to the jury included specific, detailed instructions on self-defense as follows:

> Self-defense against danger of death or great bodily harm.
>
> The defendant is asserting an affirmative defense known as self-defense against danger of death or great bodily harm.
>
> The burden of going forward with the evidence of self-defense against danger of death or great bodily harm and the burden of proving an affirmative defense are upon the defendant. He must establish such a defense by a preponderance of the evidence. * * *
>
> Up until this time, we've been discussing beyond a reasonable doubt, proof beyond a reasonable doubt. That's the State's burden of proof.
>
> When it comes to an affirmative defense however the burden is lower on the defendant to prove by the greater weight or the preponderance of the evidence his position in the use of self-defense. * * *
>
> Preponderance of the evidence is the greater weight of evidence; that is evidence that you believe because it outweighs or overbalances in your minds the evidence opposed to it.
>
> A preponderance means the evidence that is more probable, more persuasive, or of greater probative value. It is the quality of the evidence that must be weighed. Quality may or may not be identical with quantity or the greater number of witnesses.
>
> In determining whether or not the affirmative defense has been proven by a preponderance of the evidence, you should consider all of the evidence bearing upon the affirmative defense regardless of who produced it.

If the weight of the evidence is equally balanced or if you are unable to determine which side of an affirmative defense has the preponderance, then the defendant has not established such affirmative defense.

If the defendant fails to establish the defense of self-defense against danger of death or great bodily harm, the State still must prove to you beyond a reasonable doubt all of the essential elements of the crimes charged or any lesser included offense.

The defendant claims to have acted in self-defense. To establish a claim of self-defense, the defendant must prove by the greater weight of the evidence that: He was not at all at fault in creating this situation giving rise to the death of DeSean L. Perkins; and he had reasonable grounds to believe and an honest belief, even if mistaken, that he was in imminent or immediate danger of death or great bodily harm, and that his only reasonable means of retreat, escape, or withdrawal from such danger was by the use of deadly force; and he had not violated any duty to retreat, escape, or withdraw to avoid the danger.

The defendant had a duty to retreat if: The defendant was at fault in creating the situation giving rise to the death of DeSean L. Perkins; or the defendant did not have reasonable grounds to believe and an honest belief that he was in imminent or immediate danger of death or great bodily harm, or that he had a reasonable means of escape from that danger other than by the use of deadly force.

The defendant no longer had a duty to retreat if: He retreated, escaped or withdrew from the situation or reasonably indicated his intention to retreat, escape or withdraw from the situation and no longer participated in it; and he then had reasonable grounds to believe and an honest belief that he was in imminent or immediate danger of death or great bodily harm; and the only reasonable means of escape from that danger was by the use of deadly force, even though he was mistaken as to the existence of that danger.

Tests of reasonableness.

Words alone do not justify the use of deadly force or force. Resort to such force is not justified by abusive language, or verbal threats, or other words, no matter how provocative.

In deciding whether the defendant had reasonable grounds to believe and an honest belief that he was in imminent or immediate danger of death or great bodily harm, you must put yourself in the position of the defendant, with his characteristics, his knowledge or lack of knowledge, and under the circumstances and conditions that surrounded him at that time, you must consider the conduct of DeSean L. Perkins and determine if his acts and words caused the defendant reasonably and honestly to believe that he was about to be killed or receive great bodily harm.

If the defendant used more force than reasonably necessary and if the force used is greatly disproportionate to the apparent danger, then the defense of self-defense is not available.

If the defendant fails to establish the defense of self-defense against danger of death or great bodily harm, the State must still prove to you beyond a reasonable doubt all of the essential elements of the crime of aggravated murder, murder, felonious assault, and involuntary manslaughter as charged in the indictment in order for you to find him guilty of that offense.

If you find that the State proved beyond a reasonable doubt all of the essential elements of the offense of self-defense against danger of death or great bodily harm, and if you further find that the defendant failed to prove by a preponderance of the evidence the defense of self-defense, your verdict must be guilty.

If you find that the State failed to prove beyond a reasonable doubt any one of the essential elements of the offense of self-defense against the danger of death or great bodily harm, or if you find that the defendant proved by a preponderance of the evidence the defense of self-defense, then you must find the defendant not guilty.

{¶ 92} We must presume that the jury followed these instructions. *See, e.g., State v. Willis*, 8th Dist. Cuyahoga No. 107070, 2019-Ohio-537, ¶ 19. Jones does not dispute that the trial court's jury instructions, including its jury instructions on the defense of self-defense, were full and complete, accurately stated the law and

contained all of the jury instructions that were relevant and necessary for the jury to weigh the evidence and discharge its duty as the trier of fact.

{¶ 93} Defense counsel repeatedly argued both in opening and closing arguments that Jones had acted in self-defense. Even without a separate verdict form on the issue of self-defense, the jury was well aware that it was free to consider Jones' claim of self-defense and to find him not guilty of the offenses to which the defense applied on that basis, if they believed him.

{¶ 94} We find no error, much less any plain error, here. Jones has provided no legal authority that a jury must reject an affirmative defense of self-defense on a verdict form. *See State v. McClain*, 5th Dist. Guernsey No. 10-CA-10, 2011-Ohio-1623, ¶ 40 ("We * * * find no law in the state of Ohio requiring the jury verdict forms to *provide* a place for a jury to reject an affirmative defense."); *State v. Hobbs*, 5th Dist. Richland No. 2007-CA-0115, 2008-Ohio-4658, ¶ 18 (finding no error in the trial court's omission of affirmative defense of inability to pay on verdict form, noting that "we have found nothing which requires or suggests that an affirmative defense be set forth on the verdict form."); *see also State v. Reeds*, 11th Dist. Lake No. 2007-L-120, 2008-Ohio-1781, ¶ 53, 62 (while conceding that "it may be argued that inclusion of a separate finding relating to self-defense would ensure clarity," finding no error where the verdict form did not contain a separate finding for self-defense); *State v. Black*, 5th Dist. Stark No. 2011 CA 00175, 2012-Ohio-2874, ¶ 42 (no plain error where the trial court did not provide the jury with a separate verdict

form for the defense of self-defense).  Accordingly, Jones' third assignment of error is overruled.

**Ineffective Assistance of Counsel**

{¶ 95}  In his fourth assignment of error, Jones contends that he was denied effective assistance of counsel because his trial counsel failed to request a separate verdict form on his defense of self-defense.

{¶ 96} A criminal defendant has the right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).  To establish ineffective assistance of counsel, a defendant must demonstrate: (1) deficient performance by counsel, i.e., that counsel's performance fell below an objective standard of reasonable representation, and (2) that counsel's errors prejudiced the defendant, i.e., a reasonable probability that but for counsel's errors, the result of the trial would have been different.  *Strickland* at 687-688, 694; *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraphs two and three of the syllabus; *see also State v. Ford*, 158 Ohio St.3d 139, 2019-Ohio-4539, 140 N.E.3d 616, ¶ 391 ("Reversal of a conviction for ineffective assistance of counsel requires that the defendant show, first, that counsel's performance was deficient and second, that the deficient performance prejudiced the defendant so as to deprive the defendant of a fair trial.").  "Reasonable probability" is "probability sufficient to undermine confidence in the outcome."  *Strickland* at 694.

{¶ 97} In Ohio, every properly licensed attorney is presumed to be competent.  *State v. Black*, 8th Dist. Cuyahoga No. 108001, 2019-Ohio-4977, ¶ 35,

citing *State v. Smith*, 17 Ohio St.3d 98, 100, 477 N.E.2d 1128 (1985). Thus, in evaluating counsel's performance on a claim of ineffective assistance of counsel, the court must give great deference to counsel's performance and "indulge a strong presumption" that counsel's performance "falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689; *see also State v. Powell*, 2019-Ohio-4345, 134 N.E.3d 1270, ¶ 69 (8th Dist.) ("'A reviewing court will strongly presume that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'"), quoting *State v. Pawlak*, 8th Dist. Cuyahoga No. 99555, 2014-Ohio-2175, ¶ 69.

**{¶ 98}** As a general matter, defense counsel's tactical decisions and trial strategies, even "debatable" ones, do not constitute ineffective assistance of counsel. *See, e.g., Black*, 2019-Ohio-4977, at ¶ 35; *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶ 101, 111. Reviewing courts "will ordinarily refrain from second-guessing strategic decisions counsel make at trial," even where trial counsel's strategy was "questionable" and even where appellate counsel argues that he or she would have defended the case differently. *State v. Myers*, 97 Ohio St.3d 335, 2002-Ohio-6658, 780 N.E.2d 186, ¶ 152; *State v. Mason*, 82 Ohio St.3d 144, 169, 694 N.E.2d 932 (1998); *State v. Quinones*, 8th Dist. Cuyahoga No. 100928, 2014-Ohio-5544, ¶ 25.

**{¶ 99}** Once again, Jones has cited no authority in support of his contention that trial counsel's failure to request a separate verdict form on the issue of self-defense constituted ineffective assistance of counsel.

{¶ 100} The Fifth District considered a similar argument in *Black*, 2012-Ohio-2874.  In that case, the court found no ineffective assistance of counsel where counsel failed to request a separate verdict form for the defense of self-defense.  *Id.* at ¶ 42.

{¶ 101} In *Chavez*, 2020-Ohio-426, the defendant also claimed ineffective assistance counsel based, in part, on his trial counsel's failure to request a separate finding on the verdict form for his defense of self-defense.  *Id.* at ¶ 65.  In that case, as in this case, the verdict form submitted to the jury did not include a separate finding on self-defense.  The verdict form simply had a finding for the charge and a blank for the insertion of "guilty" or "not guilty."  *Id.* at ¶ 65, 77.  However, in *Chavez*, trial counsel had "agreed" to "incomplete" jury instructions on the issue of self-defense.  The court concluded that this constituted deficient performance by defense counsel.  *Id.* at ¶ 61, 71-73.  This is not the case here.

{¶ 102} Despite its finding that trial counsel had erred in agreeing to incomplete jury instructions, the court stated that "'[w]hile it may be argued that inclusion of a separate finding relating to self-defense would ensure clarity,' the failure to request that the affirmative-defense-verdict instruction be included on a verdict form will not rise to error unless there is a reasonable probability that, but for defense counsel's failure, the result of the proceeding would have been different."  *Id.* at ¶ 77, quoting *Reeds*, 2008-Ohio-1781, at ¶ 62.  The court found that there was no reasonable probability that, but for trial counsel's errors, the result of the defendant's trial would have been different.   *Chavez* at ¶ 79, 81.  Accordingly, the

court rejected the defendant's ineffective assistance of counsel claim and affirmed his conviction. *Id.* at ¶ 81, 87.

{¶ 103} A similar result is warranted here. In this case, even if trial counsel had erred in failing to request a separate verdict form on the issue of self-defense, we cannot say that there is a reasonable probability that, but for trial counsel's failure, the result of Jones' trial would have been different

{¶ 104} Jones has not explained how or why he believes he was prejudiced as a result of trial counsel's failure to request a separate verdict form on self-defense. As detailed above, the trial court provided full and complete jury instructions on the issue of self-defense. Even without a separate verdict form on self-defense, the jury was well aware that it was free to consider the defense and to find Jones not guilty of the offenses to which the defense applied if they believed him.

{¶ 105} Accordingly, Jones' fourth assignment of error is overruled.

**Consecutive Sentences on Firearm Specifications**

{¶ 106} In his fifth assignment of error, Jones contends that the trial court erred in imposing consecutive sentences on the three-year firearm specifications associated with Count 4 (murder) and Count 7 (trafficking) because (1) the trial court failed to "undertake any analysis as to whether those firearm specifications were allied offenses of similar import" under R.C. 2941.25 and (2) the underlying offenses were committed as part of the same act or transaction under R.C. 2929.14(B)(1)(b).

{¶ 107} As an initial matter, we note that the trial court was not required to undertake an allied offense analysis of the firearm specifications because a firearm specification is not a separate offense; it is merely a sentence enhancement. As such, firearm specifications cannot be allied offenses of similar import. As this court explained in *State v. Chapman*, 8th Dist. Cuyahoga No. 107375, 2019-Ohio-1452:

> The sentences imposed for firearm specifications are sentencing enhancements. *State v. Dean*, 146 Ohio St.3d 106, 2015-Ohio-4347, 54 N.E.3d 80, ¶ 219, citing *State v. Ford*, 128 Ohio St.3d 398, 2011-Ohio-765, 945 N.E.2d 498, ¶ 16-19, and *State v. Cannon*, 8th Dist. Cuyahoga No. 100658, 2014-Ohio-4801, ¶ 58. As sentencing enhancements, the firearm specifications are not separate offenses capable of standing alone. *State v. Roper*, 9th Dist. Summit Nos. 26631 and 26632, 2013-Ohio-2176, ¶ 10, citing *Ford* at ¶ 9-16 (firearm specification statute does not contain a positive prohibition of conduct under the statute defining "an offense"). As the Ohio Supreme Court has unambiguously concluded, "R.C. 2941.25 addresses the merger of two or more offenses." [The defendant] cannot rely on R.C. 2941.25 to argue that the sentences imposed for the firearm specifications should merge. *Id.*

*Chapman* at ¶ 17.

{¶ 108} With respect to Jones' argument under R.C. 2929.14(B)(1)(b), that provision states, in relevant part: "Except as provided in division (B)(1)(g) of this section, a court shall not impose more than one prison term on an offender under division (B)(1)(a) of this section for felonies committed as part of the same act or transaction." Accordingly, ordinarily, a trial court is prohibited from imposing sentence on multiple firearm specifications for "felonies committed as part of the same act or transaction." *See, e.g., State v. James*, 2015-Ohio-4987, 53 N.E.3d 770, ¶ 40 (8th Dist.).

{¶ 109} However, R.C. 2929.14(B)(1)(g) provides:

If an offender is convicted of or pleads guilty to two or more felonies, if one or more of those felonies are aggravated murder, murder, attempted aggravated murder, attempted murder, aggravated robbery, felonious assault, or rape, and if the offender is convicted of or pleads guilty to a specification of the type described under division (B)(1)(a) of this section in connection with two or more of the felonies, the sentencing court shall impose on the offender the prison term specified under division (B)(1)(a) of this section for each of the two most serious specifications of which the offender is convicted or to which the offender pleads guilty and, in its discretion, also may impose on the offender the prison term specified under that division for any or all of the remaining specifications.

{¶ 110} R.C. 2929.14(C)(1)(a) further provides, in relevant part:

[I]f a mandatory prison term is imposed upon an offender pursuant to division (B)(1)(a) of this section for having a firearm on or about the offender's person or under the offender's control while committing a felony, if a mandatory prison term is imposed upon an offender pursuant to division (B)(1)(c) of this section for committing a felony specified in that division by discharging a firearm from a motor vehicle, or if both types of mandatory prison terms are imposed, the offender shall serve any mandatory prison term imposed under either division consecutively to any other mandatory prison term imposed under either division * * *, consecutively to and prior to any prison term imposed for the underlying felony * * *, and consecutively to any other prison term or mandatory prison term previously or subsequently imposed upon the offender.

Thus, where, as here, a defendant is found guilty of two or more felonies (one of which is murder) and two or more of those felony counts included firearm specifications of which the defendant is also found guilty, the trial court is required to impose consecutive prison terms for the two most serious specifications, creating an exception to the general rule that a trial court may not impose multiple, consecutive firearm specifications for crimes committed as part of the same act or transaction. *See, e.g., State v. Martemus*, 8th Dist. Cuyahoga No. 106327, 2019-

Ohio-1116, ¶ 6; *Nitsche*, 2016-Ohio-3170, 66 N.E.3d 135, at ¶ 50-54; *see also State v. Tyler*, 9th Dist. Summit No. 29225, 2019-Ohio-4661, ¶ 65 ("Because [the defendant] was convicted of murder and felonious assault and both of his convictions carried attendant firearm specifications, the trial court was required to impose consecutive prison sentences on both of his specifications.").

{¶ 111} The consecutive imposition of the sentences on both firearm specifications was statutorily mandated. Accordingly, the trial court did not err in imposing the sentences on the firearm specifications in the manner in which they were imposed. We overrule Jones' fifth assignment of error.

**Costs**

{¶ 112} In his sixth and final assignment of error, Jones contends that the trial court erred by ordering him to pay court costs in the sentencing journal entry without ordering such costs in open court at the sentencing hearing.

{¶ 113} A court is required, in criminal cases, to "include in the sentence the costs of prosecution * * * and render a judgment against the defendant for such costs." R.C. 2947.23(A)(1)(a). However, the court "retains jurisdiction to waive, suspend, or modify the payment of the costs of prosecution * * * at the time of sentencing or at any time thereafter." R.C. 2947.23(C).

{¶ 114} The Ohio Supreme Court addressed the issue raised in this assignment of error in *State v. Beasley*, 153 Ohio St.3d 497, 2018-Ohio-493, 108 N.E.3d 1028. In that case, the court held that a defendant was not entitled to a remand based on the trial court's imposition of costs in the sentencing journal entry

that had not been imposed in open court at the sentencing hearing. The court explained:

> A convicted criminal defendant is responsible for the costs of prosecution. R.C. 2947.23(A)(1)(a). The trial court did not mention court costs during the sentencing hearing before imposing them in the entry. [The defendant] cites *State v. Joseph*, 125 Ohio St.3d 76, 2010-Ohio-954, 926 N.E.2d 278, for the proposition that it is error for a trial court to impose court costs in its sentencing entry without first informing the defendant during the sentencing hearing of its intent to do so. However, *Joseph* is no longer good law for this point. * * *
>
> A trial court has discretion to waive the payment of court costs if the defendant is indigent. *State v. White*, 103 Ohio St.3d 580, 2004-Ohio-5989, 817 N.E.2d 393, ¶ 14. * * * [B]efore [the defendant] was sentenced, the General Assembly amended R.C. 2947.23 by adding subdivision (C): "The court retains jurisdiction to waive, suspend, or modify the payment of the costs of prosecution * * * at the time of sentencing or at any time thereafter." (Emphasis added.) In simple terms, [the defendant] does not need this court to remand this case in order for him to file a motion to waive costs. Therefore, his request for a remand on this basis has no merit.

*Beasley* at ¶ 263-265. We have reviewed the transcript from the sentencing hearing and find that Jones was never advised of the imposition of court costs at the sentencing hearing. However, because Jones can move the trial court at any time to waive the payment of court costs, a remand from this court is not required to address the issue. *See, e.g., State v. Nesbit*, 8th Dist. Cuyahoga No. 107278, 2019-Ohio-1646, ¶ 64-66, citing *Beasley* at ¶ 265; *State v. Brooks*, 8th Dist. Cuyahoga No. 107977, 2019-Ohio-4060, ¶ 31.

{¶ 115} Accordingly, Jones' sixth assignment of error is overruled.

{¶ 116} Judgment affirmed.

It is ordered that appellee recover from appellant the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the Cuyahoga County Court of Common Pleas to carry out this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

---

EILEEN A. GALLAGHER, JUDGE

FRANK D. CELBREZZE, JR., P.J., and
PATRICIA A. BLACKMON, J., CONCUR