[Cite as *In re A.C.*, 2026-Ohio-1661.]

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

IN RE A.C., ET AL.                                  :

                                                    :         No. 115887

Minor Children                                      :

                                                    :

[Appeal by Mother, A.K.]                            :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** May 7, 2026

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case Nos. AD24903140 and AD24911853

---

### *Appearances:*

Patrick S. Lavelle, *for appellant*.

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney, and Joseph C. Young, Assistant Prosecuting
Attorney, *for appellee*.

LISA B. FORBES, P.J.:

{¶ 1} A.K. ("Mother") appeals the juvenile court's decision terminating her parental rights and awarding permanent custody of two of her children, A.C. (d.o.b. 1/15/2023) and B.B.K. (d.o.b. 11/5/2024) to the Cuyahoga County Division of Children and Family Services ("CCDCFS"). After reviewing the facts of the case and pertinent law, we affirm the juvenile court's judgment.

## I.   FACTUAL AND PROCEDURAL HISTORY

{¶ 2}   A.C. is the daughter of Mother and D.C.  B.B.K. is Mother and D.C.'s son.  In addition to A.C. and B.B.K., Mother has three other children:  two girls (d.o.b. 9/22/2017 and 12/24/2018) and a boy (d.o.b. 12/18/2019) (collectively the "Older Children").  The father of the Older Children — a man other than D.C. — was married to Mother; they were later divorced.  Though the custody of the Older Children is not the subject of this appeal, their custodial history is pertinent.

### A. Background

{¶ 3}   In early 2024, the two older girls revealed that D.C. had been sexually molesting them.  CCDCFS investigated and removed the Older Children and A.C. on March 27, 2024, pursuant to an ex parte order.

{¶ 4}   The next day, March 28, 2024, CCDCFS filed a complaint in juvenile court alleging that the two older girls were victims of sexual abuse and that Mother minimized the sexual-abuse allegations and failed to demonstrate protective capacity to ensure a safe home.  CCDCFS also alleged Mother used excessive physical discipline on the Older Children, including beating them with a belt and cutting one child with a knife.  According to CCDCFS, Mother also failed to provide appropriate medical care for the children, including that A.C. had severe diaper rash and that the oldest girl suffered from eczema.

{¶ 5}   CCDCFS sought and obtained predispositional temporary custody of the Older Children and A.C.  A.C. was placed in the predispositional temporary

custody of CCDCFS on March 28, 2024.[1] The Older Children were entrusted to the care of their father.

{¶ 6} On October 23, 2024, a grand jury indicted Mother and D.C. on six counts of endangering children. These charges arose under R.C. 2919.22(B)(3), for excessive discipline that created a risk of serious physical harm for the Older Children, and R.C. 2919.22(B)(4), for unwarranted disciplinary measures that created a substantial risk of impairing the Older Children's mental health and development. The grand jury also indicted Mother for three counts of intimidation of victim or witness (the Older Children) in a criminal case, under R.C. 2921.04(B)(1), and three counts of retaliation, under R.C. 2921.05(B), against the Older Children.

{¶ 7} CCDCFS filed an amended complaint on October 25, 2024, reiterating the allegations of sexual abuse and adding allegations that the older son witnessed the sexual abuse. The amended complaint also added allegations that Mother intimidated her children to prevent them from disclosing the abuse and that Mother and D.C. locked the Older Children and A.C. in the basement as part of the excessive discipline.

{¶ 8} On November 5, 2024, Mother gave birth to B.B.K. CCDCFS took emergency-temporary care and custody of him the next day.

---

[1] B.B.K. was not born until November of 2024 and, thus, was not included in the March 28, 2024 predispositional temporary custody order.

{¶ 9} The court found A.C. to be abused, neglected, and dependent and awarded temporary custody to CCDCFS on January 9, 2025. The court found B.B.K. to be dependent and committed him to the temporary custody of CCDCFS on March 31, 2025. On April 3, 2025, the court extended temporary custody of A.C. and B.B.K. to September 30, 2025.

{¶ 10} In Mother's criminal case, on August 14, 2025, the trial court found Mother guilty of the three counts of endangering children for excessive discipline that created a substantial risk of serious harm to each of the three Older Children. The trial court also found her guilty of the three counts of retaliation. The trial court found Mother not guilty of the three counts of endangering children for unwarranted discipline that created a substantial risk of serious impairment of the child's mental health or development and granted Mother's Crim.R. 29 motion dismissing the three counts of intimidation. The court imposed a total aggregate prison sentence of 27 months.[2] Mother is expected to be released from prison in early November 2027.[3]

---

[2] The court found D.C. guilty of two counts of child endangering against the two older girls and sentenced him to one-year consecutive terms of imprisonment on each of those two counts.

[3] Mother appealed her convictions. That matter is pending as of the time of this opinion.

## B. Permanent-Custody Trial Proceedings

{¶ 11} CCDCFS moved for permanent custody of A.C. and B.B.K. on September 13, 2025. On October 8, 2025, Mother moved for a second extension of temporary custody or, in the alternative, for legal custody to Maternal Grandmother.

{¶ 12} At the November 14, 2025 trial, the court heard testimony from the CCDCFS social worker assigned to the case, Kina Crowder ("Crowder") and the maternal grandmother of A.C. and B.B.K. ("Maternal Grandmother"). After those witnesses testified, the guardian ad litem ("GAL") for both A.C. and B.B.K. provided his recommendation. Before closing arguments, the foster father for A.C. and B.B.K. gave a statement. The court also admitted into evidence exhibits including certified copies of court journal entries, Mother's treatment history, and photographs and videos of the Older Children and A.C.

### 1. CCDCFS Worker Testimony

{¶ 13} CCDCFS called Crowder as its only witness. Crowder testified that she has been assigned to this matter since the summer of 2024. A.C. came to the attention of CCDCFS due to concerns that she was not being properly supervised by Mother and that she was not being properly cared for by Mother. CCDCFS had received calls raising concerns of abuse and neglect. A.C. was in the home at the time of the alleged sexual abuse of the two older sisters. B.B.K. came to the attention of CCDCFS as a result of ongoing concerns about the parents being able to protect him. According to Crowder, Mother was convicted of child endangering and was incarcerated at the time of trial. She was sentenced to 27 months in prison in

August 2025. According a trial court journal entry, D.C. was also convicted of child endangering and was also sentenced in August 2025. His sentence was two years.

{¶ 14} Crowder explained that both A.C. and B.B.K. have been in the custody of CCDCFS since their initial removals.

{¶ 15} A case plan was developed for Mother, with the permanency plan of reunification. The objectives for the case plan included that Mother complete a mental-health assessment, complete parenting and domestic-violence services and maintain her basic needs, specifically housing. Regarding the mental-health assessment, Crowder explained that referrals were made to Mother to assist her in completing her case plan. Mother preferred to continue with mental-health services she had been receiving through Ohio Guidestone. Crowder reported that Mother was compliant with mental-health services. Although Mother had not consented to share her records with CCDCFS, Crowder had gained access to them after Mother was incarcerated. Mother also completed services regarding parenting. Crowder explained that Mother was appropriate during her visits with her children. Crowder described Mother as "nurturing to both children." Mother did not miss any of the scheduled visits. Mother engaged in services for domestic violence and successfully completed the course. As relates to basic needs and stable housing, Crowder testified that Mother had been sentenced to 27 months of incarceration on August 14, 2025, and that Crowder did not know what Mother's housing situation would be upon her release from prison. Crowder reported that Mother had been engaging in services while she has been incarcerated.

{¶ 16} Crowder described A.C. and B.B.K. as bonded with their current caregivers. She explained that A.C. is "transitioning very well. She's adjusting." Initially there were some behavioral issues with A.C., in the form of some aggression, which Crowder described as "expected" as A.C. "transitioned being away from [her] . . . family." When Crowder visits the foster home for her monthly visit, she sees "no fear. [A.C.] is very friendly, very relaxed and calm." She noted that A.C. is receiving therapy for adjustment issues, to assist her with regulating her emotions. B.B.K. is "very active around the household . . . . [He's v]ery calm . . . . No issues" as of trial.

{¶ 17} Crowder was aware that Maternal Grandmother was seeking legal custody of both A.C. and B.B.K. One relative of D.C.'s had been identified as a potential relative who could care for the children. Crowder's efforts to contact that individual were unsuccessful. She received no response. Mother provided the name of another person, but efforts to connect with that person were also not successful.

{¶ 18} Maternal Grandmother had been investigated by CCDCFS to consider her appropriateness for placement. According to Crowder, there were "a lot of inconsistencies and concerns with the grandmother." Crowder explained that Maternal Grandmother had expressed that she did not believe that Mother had done the things of which she had been accused, even though the allegations had been substantiated. Specifically, Crowder testified that "[t]hese are now younger children who [are] unable to self-protect, unable to provide a narrative as how . . . their siblings did in regards to the acts that had occurred." Further, Maternal Grandmother had not reached out to Crowder to inquire into the well-being of her

grandchildren. Maternal Grandmother was denied twice as a placement by CCDCFS.

{¶ 19} Asked whether Mother had remedied the conditions that led to the removal of A.C. and B.B.K., Crowder opined that she had not. She noted that both Mother and D.C. were incarcerated at the time of trial. At that time, they had only recently been incarcerated and it was too early to determine whether they had remedied. Crowder did not believe that either parent could provide a safe, stable, and permanent home for A.C. and B.B.K. at the time of trial.

{¶ 20} On cross-examination, Crowder testified that before Mother was incarcerated and during visits, Mother had a bond with A.C. and B.B.K. She was attentive towards the children. She brought them food and utilized resources in the library when visits occurred there. She attended every weekly visitation session. Mother was "very passionate about her kids." At times, Mother was not receptive to suggestions from the parenting coach who was present during the visits. Overall, Crowder described Mother as having made significant progress during the CCDCFS case, notwithstanding her incarceration. According to Crowder, Mother had informed her that she was appealing her conviction and that she would pursue early judicial release.

{¶ 21} Crowder testified that in addition to the services identified during direct examination, Mother was also involved with Family Promise before the children's removal, as well as after. Mother complied with all Family Promise program requirements to successfully complete programs related to housing and

"RRH Programs." Moreover, Mother was participating in and engaged with programming regarding parenting while incarcerated.

{¶ 22} Crowder clarified that she had never personally spoken with Maternal Grandmother. She explained that CCDCFS had "made the decision not to move forward with the grandmother as a placement." Being approved as to appropriate space for children and no criminal background, as Maternal Grandmother was, does not equate to being approved as a placement. According to Crowder, the main concern regarding Maternal Grandmother was her inconsistency regarding Agency involvement. She explained that Maternal Grandmother has expressed that she does not believe the charges against Mother are valid which raises a concern that when Mother is released from prison, Maternal Grandmother will "give the children right back to mom, which is putting these children back into danger." The concern is that Maternal Grandmother would not protect the children.

### 2. Maternal Grandmother

{¶ 23} Mother called Maternal Grandmother as her only witness. Maternal Grandmother testified that before Mother was incarcerated she would see her grandchildren, other than B.B.K., roughly once every two weeks. Maternal Grandmother was with Mother in the hospital when B.B.K. was born, but was not permitted to bond with B.B.K.

{¶ 24} Maternal Grandmother denied that she had disbelieved the Older Children when they alleged abuse. Maternal Grandmother testified that she accepted the verdicts of the court finding Mother guilty of child endangering and

retaliation and that she would protect the children from harm. Specifically, Maternal Grandmother testified that she accepts the verdicts against Mother as well as Mother's responsibility in them.

{¶ 25} When asked how she would protect A.C. and B.B.K. after Mother was released from prison if she was awarded custody, Maternal Grandmother testified that if Mother was not allowed to be around the children, then "[t]he cops will be called." Maternal Grandmother testified regarding photographs and videos of her grandchildren, other than B.B.K., taken at her house when they were visiting her and on holidays showing the children smiling and appearing happy.

{¶ 26} Maternal Grandmother explained that she is seeking legal custody because she believes the children should be with a family member. She reiterated that they would be protected.

{¶ 27} Maternal Grandmother explained that she had contacted CCDCFS to have a visit with her grandchildren. She was not able to participate in a visit that had been scheduled for Mother and D.C. because CCDCFS told her she could not join the visit. Grandmother did not make any further attempts to see A.C. and B.B.K. after she was told no, "because they wouldn't grant me to come to even those visits — those supervised visits." Maternal Grandmother did talk with A.C. on the phone while Mother was visiting with her. B.B.K. was too young. Maternal Grandmother testified that she was working with Trumbull County where she lives to secure visitation rights for the Older Children.

{¶ 28} On cross-examination Maternal Grandmother testified that she had never said that she did not believe that her daughter whipped the Older Children with a belt. When shown her testimony from a previous hearing where she testified that she did not believe her daughter beat the children with a belt, she explained that she did not believe Mother beat her children "all over," but that she did believe it was a possibility Mother used a belt on their thighs or butts. Maternal Grandmother further testified, as she had previously, that she did not believe Mother cut one of the Older Children with a knife. Maternal Grandmother reviewed her prior testimony that she did not believe Mother had punished her children by locking them in the basement. Maternal Grandmother then testified that as of the day of trial, she did believe that the children were locked in the basement because it was proven.

{¶ 29} Maternal Grandmother testified that she believes Mother is guilty of child endangerment. She claimed she never felt otherwise. However, she explained that the prosecutor had accused Mother of "the butcher knife and the kids being soaked in urine" which were false accusations or there was no proof. An audio recording of a phone call with Mother after Mother was convicted of child endangerment was played. In the recording, after Mother told Maternal Grandmother that she was convicted of child endangerment, Maternal Grandmother responded that there was no proof of child endangerment. Maternal Grandmother explained at trial that she subsequently spoke with Mother's lawyer

and that after her conversation with the lawyer, she believed there was proof of child endangerment.

### 3. The GAL

{¶ 30} The GAL recommended granting permanent custody to CCDCFS because it was in the children's best interest. According to the GAL, granting a second extension of temporary custody related to A.C. and a first extension for B.B.K would not achieve the goal of reunification with Mother because her prison release date would not occur until more than a year after that extension expired. Further, the GAL opined that the request for legal custody to Maternal Grandmother was not well taken. The GAL explained that he had interviewed her on several occasions and that her prior testimony indicated that she "has been inconsistent regarding her belief as to the children being abused and/or neglected." According to the GAL, as recently as October 2025 he had a conversation with Maternal Grandmother in which she told him that she did not believe that her daughter was guilty. Moreover, Maternal Grandmother had not had any contact with A.C. or B.B.K. for over a year prior to trial.

{¶ 31} The court asked the GAL to confirm that neither A.C. nor B.B.K. was old enough to understand the proceedings or express their wishes. The GAL confirmed that the court was correct.

### 4. Statement of the Caregiver

{¶ 32} The foster father who was caring for A.C. for almost two years and B.B.K. for a year stated that it was an incredible blessing to love and care for these

two beautiful children.  The foster father explained that A.C. and B.B.K. had become part of the family.

### 5.  The Trial Court's Journal Entry

{¶ 33} The trial court terminated Mother's parental rights, granted permanent custody of both A.C. and B.B.K. to CCDCFS, and denied Mother's motion for an extension of temporary custody or, in the alternative, motion for legal custody to Maternal Grandmother.

{¶ 34} Mother timely appealed, raising the following three assignments of error.

> 1. The trial court's award of permanent custody to DCFS, despite DCFS's failure to make reasonable efforts to eliminate the continued removal of the children from their home and to return the children to their home, violated state law and appellant's right to due process of the law as guaranteed by the fourteenth amendment of the United States constitution and Section 16, Article I of the Ohio Constitution.
>
> 2. The trial court's decision to award permanent custody to DCFS was against the manifest weight of the evidence.
>
> 3. The trial court's failure to discuss the wishes of the children and their relationship with their mother, A.K. in determining the best interests of the children constitutes reversible error.

## II.  LAW AND ANALYSIS

{¶ 35} For ease of analysis, we address Mother's assignments of error out of order.

### A.  Manifest Weight of the Evidence

{¶ 36} With her second assignment of error, Mother challenges the termination of her parental rights under a manifest-weight standard.  Mother claims

the record lacks competent, credible evidence to support the trial court's findings that "the child cannot be placed with [Mother] or a family caregiver within a reasonable time or should not be placed with her or a family caregiver, and further that permanent custody is in the best interest of the child." We disagree.

> When reviewing for manifest weight, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered.

*In re Z.C.*, 2023-Ohio-4703, ¶ 14, citing *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20.

{¶ 37} "An appellate court will not reverse a juvenile court's termination of parental rights and award of permanent custody to an agency if the judgment is supported by clear and convincing evidence." *In re M.J.*, 2013-Ohio-5440, ¶ 24 (8th Dist.). The Ohio Supreme Court recently clarified this standard in *In re Z.C.* holding that when reviewing a court's award of permanent custody and termination of parental rights, "the proper appellate standards of review to apply . . . are the sufficiency-of-the-evidence and/or manifest-weight-of-the-evidence standards, as appropriate depending on the nature of the arguments that are presented by the parties," rather than the abuse-of-discretion standard. *Id.* at ¶ 18.

{¶ 38} "Courts apply a two-pronged test when ruling on permanent custody motions." *In re De.D.* 2020-Ohio-906, ¶ 16 (8th Dist.).

> To grant the motion, courts first must find that any of the factors in R.C. 2151.414(B)(1)(a)-(e) apply. Second, courts must determine that terminating parental rights and granting permanent custody to

CCDCFS is in the best interest of the child or children using the factors in R.C. 2151.414(D).

*Id.*

### 1. R.C. 2151.414(B)(1) and (E) Factors

{¶ 39} Under the first prong of the analysis, regarding A.C., the trial court found that a permanent-custody order was appropriate under R.C. 2151.414(B)(1)(d). The statute provides that

the court may grant permanent custody of a child to a movant if the court determines . . . by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to [CCDCFS] and that any of the following [(a) through (e) factors] apply:

. . .

(d) The child has been in the temporary custody of [CCDCFS] for twelve or more months of a consecutive twenty-two month period . . . .

For purposes of division (B)(1) of this section, a child shall be considered to have entered the temporary custody of the an agency on the earlier of the date the child is adjudicated pursuant to section 2151.28 of the Revised Code or the date that is sixty days after the removal of the child from the home.

{¶ 40} A.C. entered temporary custody and was removed from the home on March 28, 2024. CCDCFS filed its motion for permanent custody on September 13, 2025, approximately 16 months after A.C. entered CCDCFS' temporary custody. Thus, the trial court properly found that A.C. had been in Agency custody for at least twelve months of a consecutive twenty-two-month period, under R.C. 2151.414(B)(1)(d), supporting a permanent-custody order.

{¶ 41} Regarding both A.C. and B.B.K., the court found that a permanent-custody order was also appropriate under R.C. 2151.414(B)(1)(a). The statute

provides that, if granting permanent custody is also in the best interest of a child, the court may do so upon also finding:

> (a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, *and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.*

(Emphasis added.)

{¶ 42} R.C. 2151.414(E) requires a court to consider all relevant evidence to determine whether a child "cannot be placed with either parent within a reasonable period of time or should not be placed with the parents."[4] The statute enumerates factors for a court to consider in making this determination. *See* R.C. 2151.414(E)(1)-(16). If the court determines, by clear and convincing evidence, that one or more of the factors enumerated in division (E) applies, the court is instructed to enter a finding that the child "cannot be placed with either parent within a reasonable time or should not be placed with either parent." R.C. 2151.414(E).

---

[4] We note that in challenging the trial court's analysis, Mother inserts words into division (E) that do not appear in the statute. Mother argues that the record lacks competent credible evidence to support the trial court's findings that "the child cannot be placed with [Mother] or a family caregiver within a reasonable time or should not be placed with her or a family caregiver, and further that permanent custody is in the best interest of the child." R.C. 2151.414(E) makes no mention of "family caregivers." It only addresses parents. Our analysis is limited to the plain language of the statute.

{¶ 43} In reviewing a court's determination that a child cannot be placed with either parent within a reasonable time or should not be placed with either parent, we need not address each factor that the court considered. The court is instructed to make a "cannot or should not" finding if even one of the factors enumerated in R.C. 2151.414(E) applies. *See* R.C. 2151.414(E); *see also In re A.E.,* 2025-Ohio-1466 (8th Dist.).

{¶ 44} Here, the trial court concluded that neither child could be placed with Mother or D.C. within a reasonable time or should not be placed with either parent after considering the factors outlined in R.C. 2151.414(E)(1), (4), (5), (12), (14), and (16). As we are not required to address every factor supporting a permanent-custody order, we discuss only the court's determinations under R.C. 2151.414(E)(5) and (12). We find each to be supported by clear and convincing evidence.

{¶ 45} In support of the permanent-custody order, the trial court found that Mother had been incarcerated for an offense committed against the child or a sibling of the child, citing R.C. 2151.414(E)(5). The evidence presented at trial included certified copies of the sentencing journal entries for both Mother and D.C. reflecting both the trial court's findings of guilt and their sentences. Our review of the record reveals undisputed evidence that Mother and D.C. were, at the time of trial, incarcerated for endangering children, specifically at least one sibling of A.C. and B.B.K. This finding alone is sufficient to support the trial court's conclusion that A.C. and B.B.K. cannot be placed with either parent within a reasonable time or should not be placed with either parent.

**{¶ 46}** Moreover, the trial court found that "the parent is incarcerated at the time of the filing of the motion for permanent custody or the dispositional hearing of the child and will not be available to care for the child for at least eighteen months after the filing of the motion for permanent custody or the dispositional hearing," citing R.C. 2151.414(E)(12). The evidence demonstrates that both Mother and D.C. were sentenced to imprisonment on August 14, 2025. Mother was sentenced to an aggregate prison term of 27 months, and D.C. was sentenced to an aggregate prison term of two years. CCDCFS's motion for permanent custody was filed on September 13, 2025, and the dispositional hearing was held on November 14, 2025, three months after Mother and D.C. were sentenced. Thus, the evidence at trial shows that neither Mother nor D.C. will be available to care for A.C. and B.B.K. for more than 18 months after the filing of the motion for permanent custody or the hearing. Again, this finding alone is sufficient to support the trial court's conclusion that A.C. and B.B.K. cannot be placed with either parent within a reasonable time or should not be placed with either parent.

**{¶ 47}** In light of the foregoing, Mother did not demonstrate that the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. *See In re Z.C.*, 2023-Ohio-4703, at ¶ 14, citing *Eastley*, 2012-Ohio-2179, at ¶ 20. Rather, the manifest weight of the evidence supports the trial court's decisions that A.C. and B.B.K. cannot be placed with either parent within a reasonable time or should not be placed with either parent.

## 2. R.C. 2151.414(D) Best-Interest Factors

{¶ 48} Again, after finding one or more factors under R.C. 2151.414(B)(1) applies, a court may order permanent custody only upon finding that doing so is in the best interest of the child. *In re De.D.*, 2020-Ohio-906, at ¶ 16 (8th Dist.). In determining the best interest of the children, the trial court is required to "consider all relevant factors including but not limited to" five factors enumerated in R.C. 2151.414(D)(1). *See* R.C. 2151.414(D)(1)(a)-(e). "R.C. 2151.414(D)(1) does not require a juvenile court to expressly discuss each of the best-interest factors . . . . Consideration is all the statute requires." *In re A.M.,* 2020-Ohio-5102, ¶ 31. Nevertheless, the trial court not only considered the factors under R.C. 2151.414(D)(1) but also identified specific evidence in the record related to the factors.

{¶ 49} R.C. 2151.414(D)(1)(a) calls for the court to consider the "interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-or-home providers, and any other person who may significantly affect the child." The trial court noted that the children were bonded with their caregiver, with Mother, and with each other. B.B.K. did not have a bond with the Maternal Grandmother, but A.C. did interact with the Maternal Grandmother prior to removal. The court's findings were supported by the record. Crowder testified that the children were bonded with their current caregivers and Mother. Regarding Maternal Grandmother, the GAL testified that she had not had any contact with A.C. or B.B.K. for over a year prior to trial.

**{¶ 50}** R.C. 2151.414(D)(1)(b) instructs the juvenile court to consider the wishes of the children as expressed by the children or by the GAL, "with due regard for the maturity of the child." The trial court found that the children were too young to express their wishes, but the GAL recommended permanent custody. Our review of the record confirms that this was the GAL's recommendation.

**{¶ 51}** R.C. 2151.414(D)(1)(c) instructs the court to consider the children's custodial history, including whether they had been in temporary custody for twelve or more months of a consecutive twenty-two-month period. The trial court noted that A.C. had spent most of her life in the care of CCDCFS and that B.B.K. had been in CCDCFS custody since birth. As discussed above, the evidence at trial showed that A.C. had been in CCDCFS custody since March 28, 2024, when she was 14 months old, and that B.B.K. had been in CCDCFS custody since the day after his birth in November 2024.

**{¶ 52}** R.C. 2151.414(D)(1)(d) requires consideration of a child's need for a safe and stable home. The trial court found that a safe and stable home could not be achieved with either parent because, at the time of trial, both parents were incarcerated for two years for abuse perpetrated on A.C. and B.B.K.'s siblings. We note that R.C. 2151.415(D)(4) prevents a court from ordering temporary custody to continue beyond two years after the date on which the complaint was filed. Again, the evidence demonstrated that Mother was not scheduled to be released from prison until November 2027, almost four years after A.C. entered CCDCFS custody and three years after B.B.K. entered CCDCFS custody.

{¶ 53} R.C. 2151.414(D)(1)(d) also mandates consideration of whether a legally secure permanent placement can be achieved without a grant of permanent custody. Here, the trial court considered the possible alternative of granting Maternal Grandmother legal custody of the children. The trial court explained that it did not believe doing so was in the best interest of A.C. or B.B.K. because the court did not find Maternal Grandmother credible, "as she has previously testified and stated on jail calls that she does not believe that the children's siblings were abused by [Mother] . . . . Therefore, the court has concerns with [Maternal Grandmother's] ability to keep the [children] safe." Ohio courts consistently hold that the factfinder is "in the best position to assess the credibility of the witnesses who testified at trial" and is free to believe all, part of none of each witness' testimony. *State v. Jones,* 2020-Ohio-3367, ¶ 85 (8th Dist.). *See also State v. Sheline,* 2019-Ohio-528, ¶ 100 (8th Dist.) (The factfinder is in the "best position to view the witnesses and observe their demeanor, gestures, and voice inflections that are critical observations in determining the credibility of a witness and his or her testimony."). In light of Maternal Grandmother's previous statements and statements at trial, the trial court's findings are supported by the record. The trial court did not lose its way and its decision not to grant Maternal Grandmother legal custody was not against the weight of the evidence.

{¶ 54} Last, the trial court acknowledged that it considered whether any of the factors in divisions (E)(7) to (11) applied, as set forth in R.C. 2151.414(D)(1)(e).

As demonstrated by the court's analysis of divisions (E)(1), (4), (5), (12), (14) and (16), none of the identified factors applied here.

{¶ 55} Appellant has not demonstrated that the trial court clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. *See In re Z.C.*, 2023-Ohio-4703, at ¶ 14, citing *Eastley*, 2012-Ohio-2179, at ¶ 20.

{¶ 56} Accordingly, Mother's second assignment of error is overruled.

**B. Reasonable-Effort Findings**

{¶ 57} In her first assignment of error, Mother argues that, although the trial court concluded that CCDCFS had made reasonable efforts at reunification, it had failed to make "sufficient factual findings" relating to those efforts. Specifically, Mother argues that the court did not "explain why those services did not enable the children to return safely home." We disagree.

{¶ 58} "R.C. 2151.419 requires the court to determine whether the public children services agency that filed the complaint in the case has made reasonable efforts to make it possible for the child to return safely home." *In re C.N.*, 2003-Ohio-2048, ¶ 37 (8th Dist.). The Ohio Supreme Court has recognized, however, that R.C. 2151.419 "does not apply in a hearing on a motion for permanent custody filed pursuant to R.C. 2151.413." *In re C.F.*, 2007-Ohio-1104, ¶ 43. CCDCFS's motion to modify temporary custody to permanent custody in this case was filed pursuant to R.C. 2151.413, so compliance with R.C. 2151.419 was not required. Nonetheless, in *In re C.F.*, the Ohio Supreme Court held that "the state must still make reasonable

efforts to reunify the family during the child-custody proceedings prior to the termination of parental rights." *Id.*

{¶ 59} The record establishes that the CCDCFS provided Mother with a plan for reunification, which included mental-health assessment, parent-nurturing programs, and programs to address domestic violence. Crowder testified that Mother complied with the plan and that she was appropriate and nurturing during her visits with the children.

{¶ 60} However, the overriding fact of this case is that Mother was incarcerated for having abused the Older Children through excessive discipline such that she was convicted of three counts of child endangering and that she also retaliated against the Older Children, resulting in three more convictions. Mother was not scheduled to be released from prison until November 2027 — two years after the trial on CCDCFS' permanent custody motion. Accordingly, notwithstanding the case plan put into place for Mother, as discussed, Mother's incarceration prevented her from achieving reunification with the children within the statutorily permissible timeframes under R.C. 2151.415(D)(4).

{¶ 61} Similarly, as discussed, the trial court found Maternal Grandmother's testimony not credible. That conclusion supports the trial court's denial of the motion for legal custody to the Maternal Grandmother. The trial court made sufficient factual findings and those findings were supported by the record.

{¶ 62} Mother's first assignment of error is overruled.

### C. Wishes of the Children and Their Relationship with Mother

{¶ 63} In her third assignment of error, Mother argues that the trial court did not consider the wishes of the children or her relationship with them as required by R.C. 2151.414(D)(1). Again, we disagree.

{¶ 64} At the time of the November 14, 2025 hearing, A.C. was two-years and ten-months old, and B.B.K. had just turned one year old. The trial court found that the children were too young to express their wishes and looked to the GAL for guidance, as is appropriate. *See In re I.A.-W.,* 2022-Ohio-1766, ¶ 37 (8th Dist.) (In considering a motion for permanent custody, juvenile courts appropriately consider the GAL's recommendation when the children are too young to express their wishes.). *See also In re Schaefer,* 2006-Ohio-5513, ¶ 60. The GAL recommended permanent custody be granted to CCDCFS. The trial court specifically identified that it considered this recommendation in its best interest analysis.

{¶ 65} Despite Mother's claims that the trial court did not consider her relationship with her children, the trial court specifically found that both A.C. and B.B.K. have a bond with Mother. However, the court found that other considerations supported a permanent-custody order, including that both A.C. and B.B.K. "deserve[] a safe and stable home environment where [their] needs can be met and [they] can thrive[,]" which "cannot be achieved with either parent as they are incarcerated for 2 years for abuse perpetrated on the [children's] sibling." Evidence presented at trial supported the trial court's conclusion.

{¶ 66} As addressed, the trial court's judgment is supported by the manifest weight of the evidence, including the trial court's determination that awarding permanent custody to CCDCFS is in the best interest of both A.C. and B.B.K.

{¶ 67} Mother's third assignment of error is overruled.

## III. CONCLUSION

{¶ 68} Upon review, we find that clear and convincing evidence in the record supports the trial court's findings under R.C. 2151.414(B), (D), and (E). Moreover, the trial court's reasonable-efforts findings pursuant to the requirements of *In re C.F.*, 2007-Ohio-1104, and R.C. 2151.419 are supported by the record. Accordingly, the trial court did not err in terminating Mother's parental rights and granting permanent custody of the children to CCDCFS. Mother's three assignments of error are overruled.

{¶ 69} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
LISA B. FORBES, PRESIDING JUDGE

ANITA LASTER MAYS, J., and
DEENA R. CALABRESE, J., CONCUR